# NATIONAL LABOR RELATIONS BOARD *v.* CURTIN MATHESON SCIENTIFIC, INC.

No. 88–1685.   Argued December 4, 1989—Decided April 17, 1990

776

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, and STEVENS, JJ., joined. REHNQUIST, C. J., filed a concurring opinion, *post*, p. 797. BLACKMUN, J., filed a dissenting opinion, *post*, p. 798. SCALIA, J., filed a dissenting opinion, in which O'CONNOR and KENNEDY, JJ., joined, *post*, p. 801.

*Deputy Solicitor General Shapiro* argued the cause for petitioner. With him on the briefs were *Solicitor General Starr, Lawrence S. Robbins, Joseph E. DeSio, Robert E. Allen, Norton J. Come, Linda Sher,* and *Peter Winkler.*

*James V. Carroll III* argued the cause for respondent. With him on the brief were *Mark Schwartz, John B. Thomas,* and *Holly H. Williamson.**

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether the National Labor Relations Board (NLRB or Board), in evaluating an employer's claim that it had a reasonable basis for doubting a union's majority support, *must* presume that striker replacements oppose the union. We hold that the Board acted within its discretion in refusing to adopt a presumption of replacement opposition to the union and therefore reverse the judgment of the Court of Appeals.

## I

Upon certification by the NLRB as the exclusive bargaining agent for a unit of employees, a union enjoys an irrebutta-

---

*\*Marsha S. Berzon, Walter Kamiat,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States by *John S. Irving* and *Stephen A. Bokat;* and for the Manville Corporation by *William J. Rodgers.*

ble presumption of majority support for one year. *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S. 27, 37 (1987). During that time, an employer's refusal to bargain with the union is *per se* an unfair labor practice under §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA), 49 Stat. 452, as amended, 29 U. S. C. §§ 158(a)(1), 158(a)(5).[1] See *Celanese Corp. of America*, 95 N. L. R. B. 664, 672 (1951); R. Gorman, Labor Law, Unionization and Collective Bargaining 109 (1976). After the first year, the presumption continues but is rebuttable. *Fall River, supra,* at 38. Under the Board's longstanding approach, an employer may rebut that presumption by showing that, at the time of the refusal to bargain, either (1) the union did not *in fact* enjoy majority support, or (2) the employer had a "good-faith" doubt, founded on a sufficient objective basis, of the union's majority support. *Station KKHI*, 284 N. L. R. B. 1339 (1987), enf'd, 891 F. 2d. 230 (CA9 1989). The question presented in this case is whether the Board must, in determining whether an employer has presented sufficient objective evidence of a good-faith doubt, presume that striker replacements oppose the union.[2]

---

[1] Section 8 of the National Labor Relations Act provides, in pertinent part:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.        .        .        .        .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U. S. C. §§ 158(a)(1), 158(a)(5).

[2] JUSTICE SCALIA's assertion, *post*, at 801, 807 (dissenting opinion), that the question presented is whether "substantial evidence" supported the Board's "factual finding" that a good-faith doubt was not established in this case misconstrues the issue. The question on which we granted the Board's petition for certiorari is whether, in *assessing* whether a particular employer possessed a good-faith doubt, the Board must adopt a general presumption of replacement opposition to the union. See Pet. for Cert. I ("Whether, in assessing the reasonableness of an employer's asserted

The Board has long presumed that new employees hired in nonstrike circumstances support the incumbent union in the same proportion as the employees they replace. See, e. g., National Plastic Products Co., 78 N. L. R. B. 699, 706 (1948). The Board's approach to evaluating the union sentiments of employees hired to replace strikers, however, has not been so consistent. Initially, the Board appeared to assume that replacements did not support the union. See, e. g., Stoner Rubber Co., 123 N. L. R. B. 1440, 1444 (1959) (stating that it was not "unreasonable [for the employer] to assume that none of the . . . permanent replacements were union adherents"); Jackson Mfg. Co., 129 N. L. R. B. 460, 478 (1960) (stating that it was "most improbable" that replacements desired representation by the strikers' union); Titan Metal Mfg. Co., 135 N. L. R. B. 196, 215 (1962) (finding that employer had "good cause to doubt the Union's majority" because "no evidence that any of the replacements had authorized the Union to represent them" had been presented); S & M Mfg. Co., 172 N. L. R. B. 1008, 1009 (1968) (same).

A 1974 decision, Peoples Gas System, Inc., 214 N. L. R. B. 944 (1974), rev'd and remanded on other grounds sub nom.

---

doubt that an incumbent union enjoys continued majority support, the Board may refuse to apply any presumption regarding the extent of union support among replacements for striking employees"). Accord, Brief for Petitioner I. Whether the Board permissibly refused to adopt a general presumption applicable to all cases of this type is not an evidentiary question concerning the facts of this particular case. The substantial evidence standard is therefore inapplicable to the issue before us. Rather, we must determine whether the Board's refusal to adopt the presumption is rational and consistent with the Act. NLRB v. Baptist Hospital, Inc., 442 U. S. 773, 787 (1979) ("[T]he courts have the duty to review the Board's presumptions both 'for consistency with the Act, and for rationality'") (quoting Beth Israel Hospital v. NLRB, 437 U. S. 483, 501 (1978)). Whether substantial evidence supports the Board's finding that respondent did not possess an objectively reasonable doubt is a question for the Court of Appeals to consider, without applying any presumption about replacements' views, on remand.

*Teamsters Local Union 769* v. *NLRB*, 174 U. S. App. D. C. 310, 316, 532 F. 2d 1385, 1391 (1976), signalled a shift in the Board's approach. The Board recognized that "it is of course possible that the replacements, who had chosen not to engage in the strike activity, might nevertheless have favored union representation." 214 N. L. R. B., at 947. Still, the Board held that "it was not unreasonable for [the employer] to infer that the degree of union support among these employees who had chosen to ignore a Union-sponsored picket line might well be somewhat weaker than the support offered by those who had vigorously engaged in concerted activity on behalf on [sic] Union-sponsored objectives." *Ibid.*

A year later, in *Cutten Supermarket,* 220 N. L. R. B. 507 (1975), the Board reversed course completely, stating that striker replacements, like new employees generally, are presumed to *support* the union in the same ratio as the strikers they replaced. *Id.,* at 509. The Board's initial adherence to this new approach, however, was equivocal. In *Arkay Packaging Corp.,* 227 N. L. R. B. 397 (1976), review denied *sub nom. New York Printing Pressmen & Offset Workers Union, No. 51* v. *NLRB,* 575 F. 2d 1045 (CA2 1978), the Board stated that "it would be wholly unwarranted and unrealistic to presume as a matter of law that, when hired, the replacements for the union employees who had gone out on strike favored representation by the Unions to the same extent as the strikers." 227 N. L. R. B., at 397–398. See also *Beacon Upholstery Co.,* 226 N. L. R. B. 1360, 1368 (1976) (distinguishing *Cutten Supermarket* on the ground that the strikers in *Beacon Upholstery* had been lawfully discharged, so there were no striking employees in the bargaining unit). Nevertheless, in *Windham Community Memorial Hospital,* 230 N. L. R. B. 1070 (1977), enf'd, 577 F. 2d 805 (CA2 1978), the Board explicitly reaffirmed *Cutten Supermarket,* stating that "[t]he general rule . . . is that new employees, including striker replacements, are presumed to support the union in the same ratio as those whom they have replaced." 230

N. L. R. B., at 1070. The Board distinguished *Arkay Packaging* as a "limited exception" to this rule based on "the unique circumstance that the union had apparently abandoned the bargaining unit." 230 N. L. R. B., at 1070. Finally, in 1980, the Board reiterated that the presumption that new employees support the union applies equally to striker replacements. *Pennco, Inc.*, 250 N. L. R. B. 716, 717–718 (1980), enf'd, 684 F. 2d 340 (CA6), cert. denied, 459 U. S. 994 (1982).

In 1987, after several Courts of Appeals rejected the Board's approach,[3] the Board determined that no universal generalizations could be made about replacements' union sentiments that would justify a presumption either of support for or of opposition to the union. *Station KKHI*, 284 N. L. R. B. 1339 (1987). On the one hand, the Board found that the prounion presumption lacked empirical foundation because "incumbent unions and strikers sometimes have shown hostility toward the permanent replacements," and "replacements are typically aware of the union's primary concern for the striker's welfare, rather than that of the replacements." *Id.*, at 1344. On the other hand, the Board found that an antiunion presumption was "equally unsupportable" factually. *Ibid.* The Board observed that a striker replacement "may be forced to work for financial reasons, or may disapprove of the strike in question but still desire union representation and would support other union initiatives." *Ibid.* Moreover, the Board found as a matter of policy that adoption of an antiunion presumption would "substantially impair the employees' right to strike by adding to the risk of replacement the risk of loss of the bargaining representative as soon as replacements equal in number to the strikers are willing to cross the picket line." *Ibid.* See also *Pennco, Inc.*, 250 N. L. R. B., at 717. Accordingly, the Board held that it would not apply any presumption regarding striker replace-

---

[3] See n. 7, *infra.*

ments' union sentiments, but would determine their views on a case-by-case basis. 284 N. L. R. B., at 1344–1345.

## II

We now turn to the Board's application of its *Station KKHI* no-presumption approach in this case. Respondent Curtin Matheson Scientific, Inc., buys and sells laboratory instruments and supplies. In 1970, the Board certified Teamsters Local 968, General Drivers, Warehousemen and Helpers (hereinafter Union) as the collective-bargaining agent for respondent's production and maintenance employees. On May 21, 1979, the most recent bargaining agreement between respondent and the Union expired. Respondent made its final offer for a new agreement on May 25, but the Union rejected that offer. Respondent then locked out the 27 bargaining-unit employees. On June 12, respondent renewed its May 25 offer, but the Union again rejected it. The Union then commenced an economic strike. The record contains no evidence of any strike-related violence or threats of violence.

Five employees immediately crossed the picket line and reported for work. On June 25, while the strike was still in effect, respondent hired 29 permanent replacement employees to replace the 22 strikers. The Union ended its strike on July 16, offering to accept unconditionally respondent's May 25 contract offer. On July 20, respondent informed the Union that the May 25 offer was no longer available. In addition, respondent withdrew recognition from the Union and refused to bargain further, stating that it doubted that the Union was supported by a majority of the employees in the unit. Respondent subsequently refused to provide the Union with information it had requested concerning the total number of bargaining-unit employees on the payroll, and the job classification and seniority of each employee. As of July 20, the bargaining unit consisted of 19 strikers, 25 permanent replacements, and the 5 employees who had crossed the picket line at the strike's inception.

On July 30, the Union filed an unfair labor practice charge with the Board. Following an investigation, the General Counsel issued a complaint, alleging that respondent's withdrawal of recognition, refusal to execute a contract embodying the terms of the May 25 offer, and failure to provide the requested information violated §§ 8(a)(1) and 8(a)(5) of the NLRA, 29 U. S. C. §§ 158(a)(1), 158(a)(5). In its defense to the charge, respondent claimed that it had a reasonably based, good-faith doubt of the Union's majority status. The Administrative Law Judge agreed with respondent and dismissed the complaint. The Board, however, reversed, holding that respondent lacked sufficient objective basis to doubt the Union's majority support. 287 N. L. R. B. 350 (1987).

First, the Board noted that the crossover of 5 of the original 27 employees did not in itself support an inference that the 5 had repudiated the Union, because their failure to join the strike may have "indicate[d] their economic concerns rather than a lack of support for the union." 287 N. L. R. B., at 352. Second, the Board found that the resignation from their jobs of two of the original bargaining-unit employees, including the chief shop steward, after the commencement of the strike did not indicate opposition to the Union, but merely served to reduce the size of the bargaining unit as of the date of respondent's withdrawal of recognition. Ibid.[4] Third, the Board discounted statements made by six employees to a representative of respondent during the strike. Although some of these statements may have indicated rejec-

_____

[4] The Board also found that statements made by chief shop steward Shady Goodson before his resignation did not indicate his lack of support for the Union. Goodson reportedly told respondent's employee relations director that he was in the middle of an uncomfortable situation in that the employees did not want the strike, that he was having difficulty staffing the picket line, and that the Union was not providing sufficient assistance in maintaining the picket line. The Board found that these statements "conveyed only a disapproval of the Union's conduct of the strike," and could not be "reasonably interpreted as a repudiation of the Union as the employees' representative." 287 N. L. R. B., at 352.

tion of the Union as the bargaining representative, the Board noted, others "appear[ed] ambiguous at best." *Id.*, at 353. Moreover, the Board stated, "[e]ven attributing to them the meaning most favorable to the Respondent, it would merely signify that 6 employees of a total bargaining unit of approximately 50 did not desire to keep the Union as the collective-bargaining representative." *Ibid.*[5]

Finally, regarding respondent's hiring of striker replacements, the Board stated that, in acccordance with the *Station KKHI* approach, it would "not use any presumptions with respect to [the replacements'] union sentiments," but would instead "take a case-by-case approach [and] require additional evidence of a lack of union support on the replacements' part in evaluating the significance of this factor in the employer's showing of good-faith doubt." 287 N. L. R. B., at 352. The Board noted that respondent's only evidence of the replacements' attitudes toward the Union was its employee relations director's account of a conversation with one of the replacements. The replacement employee reportedly told her that he had worked in union and nonunion workplaces and did not see any need for a union as long as the company treated him

---

[5] According to respondent's director of employee relations, Elizabeth Price, two of the crossover employees, Tony Lopez and Bill Lee, told her that the Union had done nothing for the employees and that they would not pay their union dues because they would not support the Union. Price also stated that striker J. R. Blackshire expressed his anger over the Union's handling of strike payments and requested reinstatement. Blackshire also reportedly said that "there was no union[,] that people were not supporting it[, and] that there were other striking employees who wanted to return to work." 287 N. L. R. B., at 351. Price also stated that striker Clint Waller told her that he was not walking the picket line because he felt that the Union was not representing the employees, and that he wanted the strike to end. Waller later resigned from the Union. Striker Raymond Brunner reportedly told Price that he had thought about retiring because he no longer wanted to work with the Union. Price stated that striker replacement David Schneider told her that he did not think that the Union supported the employees and did not see any need for a union as long as the employer treated him well. *Ibid.*

well; in addition, he said that he did not think the Union in this case represented the employees. *Id.*, at 351; see n. 4, *supra.* The Board did not determine whether this statement indicated the replacement employee's repudiation of the Union, but found that the statement was, in any event, an insufficient basis for "inferring the union sentiments of the replacement employees as a group." 287 N. L. R. B., at 353.

The Board therefore concluded that "the evidence [was] insufficient to rebut the presumption of the Union's continuing majority status." *Ibid.* Accordingly, the Board held that respondent had violated §§ 8(a)(1) and 8(a)(5) by withdrawing recognition from the Union, failing to furnish the requested information, and refusing to execute a contract embodying the terms respondent had offered on May 25, 1979. The Board ordered respondent to bargain with the Union on request, provide the requisite information, execute an agreement, and make the bargaining-unit employees whole for whatever losses they had suffered from respondent's failure to execute a contract.

The Court of Appeals, in a divided opinion, refused to enforce the Board's order, holding that respondent was justified in doubting the Union's majority support. 859 F. 2d 362 (CA5 1988). Specifically, the court rejected the Board's decision not to apply any presumption in evaluating striker replacements' union sentiments and endorsed the so-called "Gorman presumption" that striker replacements oppose the union.[6] We granted certiorari, 492 U. S. 905 (1989), to re-

---

[6] The "Gorman presumption" derives its name from Professor Robert Gorman's statement in his labor law treatise that "if a new hire agrees to serve as a replacement for a striker (in union parlance, as a strikebreaker, or worse), it is generally assumed that he does not support the union and that he ought not be counted toward a union majority." R. Gorman, Labor Law, Unionization and Collective Bargaining 112 (1976). In context, however, this statement does not appear to endorse a presumption, but seems merely to describe the Board's former approach to evaluating

solve a Circuit split on the question whether the Board must presume that striker replacements oppose the union.[7]

### III

### A

This Court has emphasized often that the NLRB has the primary responsibility for developing and applying national labor policy. See, e. g., *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 500–501 (1978); *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963); *NLRB* v. *Truck Drivers*, 353 U. S. 87, 96 (1957).

> "Because it is to the Board that Congress entrusted the task of 'applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms,' that body, if it is to accomplish the task which Congress set for it, necessarily must have authority to formulate rules to fill the interstices of the broad statutory provisions." *Beth Israel Hospital, supra,* at 500–501 (quoting *Republic Aviation Corp.* v. *NLRB*, 324 U. S. 793, 798 (1945)).

This Court therefore has accorded Board rules considerable deference. See *Fall River Dyeing & Finishing Corp.* v.

---

replacements' union sentiments. *Id.*, at 112–113 (citing *Titan Metal Mfg. Co.*, 135 N. L. R. B. 196 (1962)).

[7] In addition to the Fifth Circuit in this case, the First and Eighth Circuits have endorsed the presumption that striker replacements oppose the union, albeit in cases in which the Board had applied the contrary presumption rather than its present no-presumption approach. *Soule Glass & Glazing Co.* v. *NLRB*, 652 F. 2d 1055, 1110 (CA1 1981); *National Car Rental System, Inc.* v. *NLRB*, 594 F. 2d 1203, 1206 (CA8 1979). The Second and Sixth Circuits, however, have rejected the antiunion presumption in cases in which the Board had applied its prounion presumption. *NLRB* v. *Windham Community Hospital*, 577 F. 2d 805, 813 (CA2 1978); *NLRB* v. *Pennco, Inc.*, 684 F. 2d 340 (CA6), cert. denied, 459 U. S. 994 (1982). The Ninth Circuit has not expressly rejected the antiunion presumption but has approved the Board's no-presumption approach. See *NLRB* v. *Buckley Broadcasting Corp.*, 891 F. 2d 230, 233–234 (1989).

*NLRB*, 482 U. S., at 42; *NLRB* v. *Iron Workers*, 434 U. S. 335, 350 (1978). We will uphold a Board rule as long as it is rational and consistent with the Act, *Fall River, supra*, at 42, even if we would have formulated a different rule had we sat on the Board, *Charles D. Bonanno Linen Service, Inc.* v. *NLRB*, 454 U. S. 404, 413, 418 (1982). Furthermore, a Board rule is entitled to deference even if it represents a departure from the Board's prior policy. See *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251, 265–266 (1975) ("The use by an administrative agency of the evolutional approach is particularly fitting. To hold that the Board's earlier decisions froze the development of this important aspect of the national labor law would misconceive the nature of administrative decisionmaking"). Accord, *Iron Workers, supra*, at 351.

B

Before assessing the Board's justification for rejecting the antiunion presumption, we will make clear precisely how that presumption would differ in operation from the Board's current approach. As noted above, see *supra*, at 777–778, the starting point for the Board's analysis is the basic presumption that the union is supported by a majority of bargaining-unit employees. The employer bears the burden of rebutting that presumption, after the certification year, either by showing that the union in fact lacks majority support or by demonstrating a sufficient objective basis for doubting the union's majority status. Respondent here urges that in evaluating an employer's claim of a good-faith doubt, the Board must adopt a second, subsidiary presumption—that replacement employees oppose the union. Under this approach, if a majority of employees in the bargaining unit were striker replacements, the employer would not need to offer *any* objective evidence of the employees' union sentiments to rebut the presumption of the union's continuing majority status. The presumption of the replacements' opposition to the union would, in effect, override the presumption of continu-

ing majority status. In contrast, under its no-presumption approach, the Board "take[s] into account the particular circumstances surrounding each strike and the hiring of replacements, while retaining the long-standing requirement that the employer must come forth with some objective evidence to substantiate his doubt of continuing majority status." 859 F. 2d, at 370 (Williams, J., dissenting).[8]

## C

We find the Board's no-presumption approach rational as an empirical matter. Presumptions normally arise when proof of one fact renders the existence of another fact "so probable that it is sensible and timesaving to assume the truth of [the inferred] fact . . . until the adversary disproves

[8] Contrary to respondent's assertion, the Board's no-presumption approach does not constitute an unexplained abandonment of the good-faith doubt defense to a refusal to bargain charge. The Board's requirement of some objective evidence indicating replacements' opposition to the union does not amount to a requirement that the employer prove that the union *in fact* lacks majority status. To show a good-faith doubt, an employer may rely on circumstantial evidence; to show an actual lack of majority support, however, the employer must make a numerical showing that a majority of employees in fact oppose the union. See, *e. g.*, *Stormor, Inc.*, 268 N. L. R. B. 860, 866–867 (1984) (noting that employer need not show actual loss of majority support to prove good-faith doubt). There is no basis for assuming, then, that the Board has, *sub silentio*, forsaken the good-faith doubt standard.

The American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae*, urges us to reject the good-faith doubt standard and hold that an employer, before withdrawing recognition of the union, must show actual loss of majority status through a Board-conducted election. See also Flynn, The Economic Strike Bar: Looking Beyond the "Union Sentiments" of Permanent Replacements, 61 Temple L. Rev. 691, 720 (1988). This Court has never expressly considered the validity of the good-faith doubt standard. Cf. *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S. 27, 41, n. 8 (1987) (citing Board's good-faith doubt standard without passing on its validity). We decline to address that issue here, as both parties assume the validity of the standard, and resolution of the issue is not necessary to our decision. See *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56, 60, n. 2 (1981).

it." E. Cleary, McCormick on Evidence § 343, p. 969 (3d ed. 1984). Although replacements often may not favor the incumbent union, the Board reasonably concluded, in light of its long experience in addressing these issues, that replacements may in some circumstances desire union representation despite their willingness to cross the picket line. Economic concerns, for instance, may force a replacement employee to work for a struck employer even though he otherwise supports the union and wants the benefits of union representation. In this sense the replacement worker is no different from a striker who, feeling the financial heat of the strike on himself and his family, is forced to abandon the picket line and go back to work. Cf. *Lyng* v. *Automobile Workers*, 485 U. S. 360, 371 (1988) (recognizing that "a striking individual faces an immediate and often total drop in income during a strike"). In addition, a replacement, like a nonstriker or a strike crossover, may disagree with the purpose or strategy of the particular strike and refuse to support that strike, while still wanting that union's representation at the bargaining table.

Respondent insists that the interests of strikers and replacements are diametrically opposed and that unions inevitably side with the strikers. For instance, respondent argues, picket-line violence often stems directly from the hiring of replacements. Furthermore, unions often negotiate with employers for strike settlements that would return the strikers to their jobs, thereby displacing some or all of the replacements. See *Belknap, Inc.* v. *Hale*, 463 U. S. 491, 513–514 (1983) (BLACKMUN, J., concurring in judgment). Respondent asserts that replacements, aware of the union's loyalty to the strikers, most likely would not support the union. See, *e. g.*, *Leveld Wholesale, Inc.*, 218 N. L. R. B. 1344, 1350 (1975) ("Strike replacements can reasonably foresee that, if the union is successful, the strikers will return to work and the strike replacements will be out of a job"). In a related argument, respondent contends that the Board's no-presumption

approach is irreconcilable with the Board's decisions holding that employers have no duty to bargain with a striking union over replacements' employment terms because the "inherent conflict" between strikers and replacements renders the union incapable of "bargain[ing] simultaneously in the best interests of both strikers and their replacements." *Service Electric Co.*, 281 N. L. R. B. 633, 641 (1986); see also *Leveld Wholesale, supra,* at 1350.

These arguments do not persuade us that the Board's position is irrational. Unions do not inevitably demand displacement of all strike replacements. In *Dold Foods, Inc.,* 289 N. L. R. B. 1323 (1988), the Board based its refusal to presume that the replacements opposed the union in part on this ground:

> "[U]nions often demand, at least in the first instance, that the replacements be discharged and the strikers rehired. Frequently, as in the instant case, the union's position may be modified in the course of the negotiations on the issues underlying the strike. Indeed, in the instant case, as the strike wore on, the Union took a progressively weaker position until . . . it requested only that the Respondent discharge those replacements (about 32 out of 201 total replacements) who had not yet completed the probationary period." *Ibid.* (citation omitted).

The extent to which a union demands displacement of permanent replacement workers logically will depend on the union's bargaining power. Under this Court's decision in *NLRB* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333 (1938), an employer is not required to discharge permanent replacements at the conclusion of an economic strike to make room for returning strikers; rather, the employer must only reinstate strikers as vacancies arise. The strikers' only chance for immediate reinstatement, then, lies in the union's ability to force the employer to discharge the replacements as a condition for the union's ending the strike. Unions' leverage to compel such a strike settlement will vary greatly from

strike to strike. If, for example, the jobs at issue do not require highly trained workers and the replacements perform as well as the strikers did, the employer will have little incentive to hire back the strikers and fire the replacements; consequently, the union will have little bargaining power. Consumers' reaction to a strike will also determine the union's bargaining position. If the employer's customers have no reluctance to cross the picket line and deal with the employer, the union will be in a poor position to bargain for a favorable settlement. Thus, a union's demands will inevitably turn on the strength of the union's hand in negotiations. A union with little bargaining leverage is unlikely to press the employer—at least not very forcefully or for very long—to discharge the replacements and reinstate all the strikers. Cognizant of the union's weak position, many if not all of the replacements justifiably may not fear that they will lose their jobs at the end of the strike. They may still want that union's representation after the strike, though, despite the union's lack of bargaining strength during the strike, because of the union's role in processing grievances, monitoring the employer's actions, and performing other nonstrike roles. Because the circumstances of each strike and the leverage of each union will vary greatly, it was not irrational for the Board to reject the antiunion presumption and adopt a case-by-case approach in determining replacements' union sentiments.[9]

---

[9] JUSTICE SCALIA characterizes this view as "embarrassingly wide of the mark" and asserts, without any factual support, that unions "almost certain[ly]" demand displacement of striker replacements. *Post*, at 808 (dissenting opinion). We are confident that the Board, with its vast reservoir of experience in resolving labor disputes, is better situated than members of this Court to determine the frequency with which unions demand displacement of striker replacements.

Furthermore, the facts of this case belie JUSTICE SCALIA's sweeping characterization of the inevitability of such demands, as the Union did not negotiate for the discharge of replacements as a condition for settling the strike. See *infra*, at 793. Contrary to JUSTICE SCALIA's assertion, *post*,

Moreover, even if the interests of strikers and replacements conflict *during* the strike, those interests may converge *after* the strike, once job rights have been resolved. Thus, while the strike continues, a replacement worker whose job appears relatively secure might well want the union to continue to represent the unit regardless of the union's bargaining posture during the strike. Surely replacement workers are capable of looking past the strike in considering whether or not they desire representation by the union.[10] For these reasons, the Board's refusal to adopt an antiunion presumption is not irreconcilable with its position in *Service Electric, supra,* and *Leveld Wholesale,* 218 N. L. R. B. 1344 (1975), regarding an employer's obligation to bargain with a striking union over replacements' employment terms.

Furthermore, the Board has not deemed picket-line violence or a union's demand that replacements be terminated

---

at 809, an unconditional offer to return to work is hardly the same thing as a demand that the employer discharge all the replacements and rehire the strikers as a condition for ending the strike. Here, at the time of respondent's withdrawal of recognition from the Union, there were only 19 strikers and 25 replacements. Thus, it is unlikely that *all* the replacements would have lost their jobs even if all the strikers were reinstated. Depending on their particular jobs and skills, some replacements might not have felt threatened by the Union's offer to have the strikers return to work. More importantly, a union's *offer* turns into a *demand* only if the union can back up its position with a credible show of economic force. As explained above, *supra,* at 790–791, a union with little bargaining power is unlikely to be able to pressure the employer to reinstate the strikers. Absent record evidence to the contrary, then, we have no basis for questioning the Board's factual finding that the Union was not pressing for discharge of the replacements in this case.

[10] JUSTICE SCALIA appears to misunderstand our position. See *post,* at 810–811 (dissenting opinion). We do not mean that the replacements' attitudes toward the union *after* the strike are relevant to the Board's determination. Rather, we mean only that *during* the strike a replacement may foresee that his interests favor representation by the union after the strike. Thus, even if he opposes the strike itself, he may nevertheless want the union to continue to represent the unit because of the benefits that will accrue to him from representation after the strike.

irrelevant to its evaluation of replacements' attitudes toward the union. The Board's position, rather, is that "the hiring of permanent replacements who cross a picket line, *in itself*, does not support an inference that the replacements repudiate the union as collective-bargaining representative." *Station KKHI*, 284 N. L. R. B., at 1344 (emphasis added). In both *Station KKHI* and this case, the Board noted that the picket line was peaceful, *id.*, at 1345; 287 N. L. R. B., at 352; and in neither case did the employer present evidence that the union was actively negotiating for ouster of the replacements. To the extent that the Board regards evidence of these factors relevant to its evaluation of replacements' union sentiments, then, respondent's contentions ring hollow. Cf. *Stormor, Inc.*, 268 N. L. R. B. 860, 866–867 (1984) (concluding that replacements' crossing of picket line in face of continued violence, together with other evidence, overcame Board's former presumption that replacements favored the union); *IT Services*, 263 N. L. R. B. 1183, 1185–1188 (1982) (holding that picket line violence and union's adamant demand that replacements be terminated, together with antiunion statements by most of replacements, overcame prounion presumption).[11]

In sum, the Board recognized that the circumstances surrounding each strike and replacements' reasons for crossing a picket line vary greatly. Even if replacements often do not support the union, then, it was not irrational for the Board to conclude that the probability of replacement opposition to the union is insufficient to justify an antiunion presumption.

---

[11] Thus, assuming for the sake of argument that JUSTICE SCALIA's supposition, *post*, at 808 (dissenting opinion), that unions "almost certain[ly]" demand displacement of all strike replacements is true, such demands will be a factor in the Board's analysis in most cases. There is no reason, however, to force the Board to apply a presumption based on the premise that unions *always* make such demands when cases such as the one before us demonstrate that this premise is false.

## D

The Board's refusal to adopt an antiunion presumption is also consistent with the Act's "overriding policy" of achieving "'industrial peace.'" *Fall River*, 482 U. S., at 38 (quoting *Brooks* v. *NLRB*, 348 U. S. 96, 103 (1954)).[12] In *Fall River*, the Court held that the presumption of continuing majority support for a union "further[s] this policy by 'promot[ing] stability in collective-bargaining relationships, without impairing the free choice of employees.'" 482 U. S., at 38 (citation omitted). The Court reasoned that this presumption "enable[s] a union to concentrate on obtaining and fairly administering a collective-bargaining agreement without worrying that, unless it produces immediate results, it will lose majority support." *Ibid.* (citing *Brooks* v. *NLRB, supra,* at 100). In addition, this presumption "remove[s] any temptation on the part of the employer to avoid good-faith bargaining in the hope that, by delaying, it will undermine the union's support among the employees." 482 U. S., at 38.

The Board's approach to determining the union views of strike replacements is directed at this same goal because it limits employers' ability to oust a union without adducing any evidence of the employees' union sentiments and encourages negotiated solutions to strikes. It was reasonable for the Board to conclude that the antiunion presumption, in contrast, could allow an employer to eliminate the union merely by hiring a sufficient number of replacement employees. That rule thus might encourage the employer to avoid good-faith bargaining over a strike settlement, and instead to use the strike as a means of removing the union altogether. Cf. *id.,* at 40 ("Without the presumptions of majority support . . . , an employer could use a successor enterprise as a way of getting rid of a labor contract and of . . . eliminat[ing the union's] continuing presence"). Restricting an employer's

---

[12] We do not mean to imply that adoption of the antiunion presumption would be inconsistent with the Act's policy. That question is not before us.

ability to use a strike as a means of terminating the bargaining relationship serves the policies of promoting industrial stability and negotiated settlements. Cf. *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 233–234 (1963) ("[The Act's] repeated solicitude for the right to strike is predicated upon the conclusion that a strike when legitimately employed is an economic weapon which in great measure implements and supports the principles of the collective bargaining system").

Furthermore, it was reasonable for the Board to decide that the antiunion presumption might chill employees' exercise of their statutory right to engage in "concerted activities," including the right to strike. See 49 Stat. 452, as amended, 29 U. S. C. § 157 ("Employees shall have the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection"). If an employer could remove a union merely by hiring a sufficient number of replacements, employees considering a strike would face not only the prospect of being permanently replaced, but also a greater risk that they would lose their bargaining representative, thereby diminishing their chance of obtaining reinstatement through a strike settlement. It was rational for the Board to conclude, then, that adoption of the antiunion presumption could chill employees' exercise of their right to strike.[13]

---

[13] JUSTICE SCALIA entirely ignores the Board's policy considerations, apparently on the rationale that policy is an illegitimate factor in the Board's decision. See *post*, at 812–813 (dissenting opinion). This argument is founded on the premise that the issue before us is the factual question whether substantial evidence supports the Board's finding that respondent lacked a good-faith doubt. As stated earlier, however, see *supra* at 778–779, n. 2, the real question is whether the Board must, in assessing the objective reasonableness of an employer's doubt, adopt a particular presumption. Certainly the Board is entitled to consider *both* whether the presumption is factually justified *and* whether that presumption would disserve the Act's policies. See *Baptist Hospital*, 442 U. S., at 787. We need not determine whether the Board's policy considerations *alone* would justify its refusal to adopt the presumption urged by respondent because

Although the Board generally may not act "as an arbiter of the sort of economic weapons the parties can use," *NLRB* v. *Insurance Agents*, 361 U. S. 477, 497 (1960), it may adopt rules restricting conduct that threatens to destroy the collective-bargaining relationship or that may impair employees' right to engage in concerted activity. See, *e. g.*, *Charles D. Bonanno Linen Service* v. *NLRB*, 454 U. S., at 412, 418–419 (upholding Board rule prohibiting employer's unilateral withdrawal from multiemployer bargaining unit during impasse, "although it may deny an employer a particular economic weapon," because rule advanced "pre-eminent goal" of stability in bargaining process); *NLRB* v. *Erie Resistor Corp.*, *supra*, at 230–237 (upholding Board decision prohibiting employers from granting superseniority to strike replacements and strike crossovers because of damage superseniority would do to concerted activity and to future bargaining relationship); *NLRB* v. *Great Dane Trailers, Inc.*, 388 U. S. 26, 34–35 (1967) (upholding Board decision that employer's payment of vacation benefits to replacements, crossovers, and nonstrikers but not to strikers violated Act because of its destructive effect on concerted activity). The Board's no-presumption approach is rationally directed at protecting the bargaining process and preserving employees' right to engage in concerted activity. We therefore find, in light of the considerable deference we accord Board rules, see *supra*, at 786–787, that the Board's approach is consistent with the Act.

## IV

We hold that the Board's refusal to adopt a presumption that striker replacements oppose the Union is rational and consistent with the Act. We therefore reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

*It is so ordered.*

---

we find the Board's decision not irrational as a factual matter. See *supra*, at 788–793.

CHIEF JUSTICE REHNQUIST, concurring.

The Board's "no-presumption" rule seems to me to press to the limit the deference to which the Board is entitled in assessing industrial reality, but for the reasons stated in the opinion of the Court I agree that limit is not exceeded. The Court of Appeals did not consider, free from the use of any presumption, whether there was substantial evidence on the record as a whole to support the Board's determination here, and I believe that is a question best left for the Court of Appeals on remand.

By refusing to allow the employer to resort to what would seem to be commonsense assumptions about the views of an entire class of workers — those hired to replace strikers — the Board sharply limits the means by which an employer might satisfy the "good-faith doubt" requirement. Although the Board's opinion in this case does not preclude a finding of good-faith doubt based on circumstantial evidence, some recent decisions suggest that it now requires an employer to show that individual employees have "expressed desires" to repudiate the incumbent union in order to establish a reasonable doubt of the union's majority status. See *Tube Craft, Inc.*, 289 N. L. R. B. 862, n. 2 (1988); *Johns-Manville Sales Corp.*, 289 N. L. R. B. 358, 361 (1988); *Tile, Terrazzo & Marble Contractors Assn.*, 287 N. L. R. B. 769, n. 2 (1987). It appears that another of the Board's rules prevents the employer from polling its employees unless it first establishes a good-faith doubt of majority status. See *Texas Petrochemicals Corp.*, 296 N. L. R. B. 1057, 1064 (1989) (the standard for employer polling is the same as the standard for withdrawal of recognition). I have considerable doubt whether the Board may insist that good-faith doubt be determined only on the basis of sentiments of individual employees, and at the same time bar the employer from using what might be the only effective means of determining those sentiments. But that issue is not before us today.

JUSTICE BLACKMUN, dissenting.

I agree with much that JUSTICE SCALIA says in his dissent, but I write separately because in certain respects his approach differs from mine. As JUSTICE SCALIA ably demonstrates, the Board's analysis in this case cannot be reconciled with its decisions in cases such as *Service Electric Co.*, 281 N. L. R. B. 633 (1986), and *Leveld Wholesale, Inc.*, 218 N. L. R. B. 1344 (1975). Those decisions rest upon the premises that a striking union inevitably will tend to favor its own members at the expense of replacement workers; that the union cannot reasonably be expected to give balanced representation to the two groups; and that the replacements "can reasonably foresee that, if the union is successful, the strikers will return to work and the strike replacements will be out of a job." *Id.*, at 1350. Those premises are, to say the least, in considerable tension with the Board's refusal to presume, without direct evidence of employee preferences, that an employer may in good faith doubt that replacement workers support the striking union.

JUSTICE SCALIA's dissent, as I read it, rests upon the belief that the Board was *correct* in *Service Electric* and *Leveld Wholesale*, and that its decision in the instant case is therefore *substantively* irrational. Certainly the views expressed in *Service Electric* and *Leveld Wholesale* accord with my own understanding of industrial reality. It seems to me eminently foreseeable that a striking union will disfavor the workers who have been hired to break the strike; that the union will attempt, as an element of the ultimate settlement, to secure the discharge of replacement employees; and that the replacements will be aware of the antagonism between the union's interests and their own.[1] But if the expert agency were to determine that the participants in the

---

[1] See *Belknap, Inc. v. Hale,* 463 U. S. 491, 513–514 (1983) (opinion concurring in judgment) ("During settlement negotiations, the union can be counted on to demand reinstatement for returning strikers as a condition for any settlement").

collective-bargaining process no longer behave in this fashion, and if it consistently acted upon this determination, I cannot say at this juncture that the Board's decision would be irrational. To invalidate the Board's order in the present case, it is not necessary to assert that the decision is based upon an implausible assessment of industrial reality. Rather, it is enough to say that the Board in this case has departed, without explanation, from principles announced and reaffirmed in its prior decisions. The agency has made no effort to explain the apparent inconsistency between the decision here and its analyses in *Service Electric* and *Leveld Wholesale*, and its order is invalid on that basis alone.[2]

I am struck, moreover, by the Board's lack of empirical support for its position—a significant point in view of the fact that for 25 years the Board presumed that replacement workers opposed the striking union. If the Board's refusal to adopt such a presumption is based, at least in part, on policy concerns (*e. g.*, the fear that employers would abuse the bargaining process by "hiring their way out" of their statutory duty), it seems reasonable to expect the Board to show (or at least to assert) that such abuses actually occurred during the period the presumption was in place. I am also troubled by the fact, noted in THE CHIEF JUSTICE's concurring opinion, *ante*, at 797, that while the Board appears to require that good-faith doubt be established by express avowals of individual employees, other Board policies make it practically impossible for the employer to amass direct evidence of its workers' views.[3] The point, I emphasize, is that the propri-

---

[2] See *Greater Boston Television Corp.* v. *FCC*, 143 U. S. App. D. C. 383, 394, 444 F. 2d 841, 852 (1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute") (footnote omitted), cert. denied, 403 U. S. 923 (1971).

[3] The NLRB has recently reaffirmed its rule that an employer must meet the same good-faith doubt standard in order to poll its employees, petition

ety of the no-presumption rule cannot be determined simply by asking whether the rule, in isolation, is irrational or rests on a demonstrably misguided view of the facts. Rather, the reviewing court also must ask whether the agency's decision is the product of an adequate deliberative process and is consonant with other agency pronouncements in analogous areas.

Perhaps the difference between my approach and that of JUSTICE SCALIA is one only of emphasis, but I think that the difference is worth noting. Rarely will a court feel so certain of the wrongness of an agency's empirical judgment that it will be justified in substituting its own view of the facts. But courts can and should review agency decisionmaking closely to ensure that an agency has adequately explained the bases for its conclusions, that the various components of its policy form an internally consistent whole, and that any apparent contradictions are acknowledged and addressed. This emphasis upon the decisionmaking *process* allows the reviewing court to exercise meaningful control over unelected officials without second-guessing the sort of expert judgments that a court may be ill equipped to make. Such an approach also affords the agency a broad range of discretion. Confronted with a court's conclusion that two of its policy pronouncements are inconsistent, the agency may choose for itself which path to follow, or it may attempt to explain why no contradiction actually exists.

This Court has never held that the Board is required by statute to recognize the good-faith doubt defense, and the Board's power to eliminate that defense remains an open

---

the Board for an election, or withdraw recognition from the union. *Texas Petrochemicals Corp.*, 296 N. L. R. B. 1057, 1064 (1989). If good-faith doubt can be established only by the express statements of individual workers, the employer is placed in a difficult bind. See *Mingtree Restaurant, Inc.* v. *NLRB*, 736 F. 2d 1295, 1297 (CA9 1984) ("By the Board's reasoning, an employer in doubt of the union's majority status would be allowed to take a poll only when it had no actual need to do so, that is, when it already had sufficient objective evidence to justify withdrawal of recognition").

question. The Board has not purported to take that step, however, and the agency has articulated no legitimate basis for its conclusion that the employer in this case lacked a good-faith doubt as to the union's majority support. The Board may not assert in one line of cases that the interests of a striking union and replacement workers are irreconcilably in conflict, and proclaim in a different line of decisions that no meaningful generalizations can be made about the union sentiments of the replacement employees. I therefore conclude that the judgment of the Court of Appeals should be affirmed.

I respectfully dissent.

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE KENNEDY join, dissenting.

The Court makes heavy weather out of what is, under well-established principles of administrative law, a straightforward case. The National Labor Relations Board (NLRB or Board) has established as one of the central factual determinations to be made in § 8(a)(5) unfair-labor-practice adjudications, whether the employer had a reasonable, good-faith doubt concerning the majority status of the union at the time it requested to bargain. The Board held in the present case that such a doubt was not established by a record showing that at the time of the union's request a majority of the bargaining unit were strike replacements, and containing no affirmative evidence that any of those replacements supported the union. The question presented is whether that factual finding is supported by substantial evidence. Since the principal employment-related interest of strike replacements (to retain their jobs) is almost invariably opposed to the principal interest of the striking union (to replace them with its striking members) it seems to me impossible to conclude on this record that the employer did not have a reasonable, good-faith doubt regarding the union's majority status. The Board's factual finding being unsupported by substantial evidence, it cannot stand. I therefore dissent from the judg-

ment reversing the Fifth Circuit's refusal to enforce the Board's order.

I

As the Court describes, the union was certified in 1970. In 1979, before the strike, the bargaining unit was composed of 27 employees. After the strike began, 5 employees crossed the picket line and 29 new employees were hired to replace the strikers. On July 16, the union offered to return to work under the terms of respondent's last prestrike proposal. On July 20, respondent rejected this offer, withdrew recognition from the union, and refused to bargain further, stating that it doubted that the union represented a majority of the employees in the bargaining unit. On that date, according to the Board, the bargaining unit consisted of 49 employees: 19 strikers, 5 employees who had crossed the picket line to return to work, and 25 strike replacements. The union filed an unfair-labor-practice charge with the Board, and the Board's General Counsel filed a complaint charging that respondent had violated § 8(a)(5) (and thereby § 8(a)(1)) of the National Labor Relations Act (NLRA), 49 Stat. 452, as amended, 29 U. S. C. §§ 158(a)(1) and (5). After a formal hearing, the Administrative Law Judge (ALJ) found that respondent, at the time it withdrew recognition, had an objectively reasonable, good-faith doubt that the union represented a majority of the employees in the bargaining unit. The General Counsel introduced no evidence that the union in fact commanded the support of a majority of the employees, and the ALJ dismissed the complaint.

The Board reversed and entered an order finding that respondent had violated the NLRA. The Board began by reciting its longstanding rule that " '[a]n employer who wishes to withdraw recognition after a year may do so . . . by presenting evidence of a sufficient objective basis for a reasonable doubt of the union's majority status at the time the employer refused to bargain.'" 287 N. L. R. B. 350, 352 (1987) (quoting *Station KKHI*, 284 N. L. R. B. 1339, 1340 (1987)).

Purporting to evaluate respondent's action under this standard, the Board concluded that respondent had not established a reasonable basis for doubting the union's majority status. First, the Board stated that there was no cause to doubt that the five strikers who crossed the picket line to return to work supported the union, because "[t]he failure of employees to join an economic strike may indicate their economic concerns rather than a lack of support for the union." 287 N. L. R. B., at 352. Second, relying on its decision in *Station KKHI*, the Board stated that the fact that 25 employees in the bargaining unit were strike replacements provided "no evidentiary basis for reasonably inferring the union sentiments of the replacement employees as a group." *Id.*, at 352–353. Third, the Board discounted the statements of 6 employees criticizing the union, because "[e]ven attributing to them the meaning most favorable to the Respondent, it would merely signify that 6 employees of a total of approximately 50 did not desire to keep the Union as the collective-bargaining representative." *Id.*, at 353 (footnote omitted).

The Fifth Circuit denied enforcement of the Board's order on the ground that respondent "was justified in doubting that the striker replacements supported the union," and that the Board's contrary conclusion was not supported by substantial evidence. 859 F. 2d 362, 365, 367 (1988).

## II

An NLRB unfair-labor-practice action is the form of administrative proceeding known as formal adjudication, governed by the Administrative Procedure Act (APA), 5 U. S. C. §§ 556, 557. See 5 U. S. C. § 554(a). In fact, it is even somewhat more judicialized than ordinary formal adjudication, since it is governed in addition by the procedural provisions of the NLRA itself, which provide, *inter alia*, that the proceeding "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the

district courts of the United States," 29 U. S. C. § 160(b). Among the attributes of formal adjudication relevant here, the agency opinion must contain "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record," 5 U. S. C. § 557(c), and a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence," 5 U. S. C. § 706(2)(E); accord, 29 U. S. C. § 160(f) ("[T]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive").

The Board's factual finding challenged in the present case is that there was no " 'sufficient objective basis for a reasonable doubt of the union's majority status at the time of the employer refused to bargain.'" 287 N. L. R. B., at 352 (quoting *Station KKHI*, 284 N. L. R. B., at 1340). The Board has held for many years that an employer's reasonable, good-faith doubt as to a certified union's continued majority status is a defense to an unfair-labor-practice charge for refusal to bargain, in the sense that it shifts to the General Counsel the burden to "come forward with *evidence* that on the refusal-to-bargain date the union in fact did represent a majority of employees in the appropriate unit." *Stoner Rubber Co.*, 123 N. L. R. B. 1440, 1445 (1959) (emphasis in original). The leading case on the subject, cited approvingly in the *Station KKHI* opinion that formed the basis for the Board's holding here, described the good-faith doubt defense as follows:

"We believe that the answer to the question whether the Respondent violated Section 8(a)(5) of the Act . . . depends, not on whether there was sufficient evidence to rebut the presumption of the Union's continuing majority status or to demonstrate that the Union in fact did not represent the majority of the employees, but upon whether *the Employer in good faith* believed that

the Union no longer represented the majority of the employees. . . .

   •      •      •      •      •

By its very nature, the issue of whether an employer has questioned a union's majority in good faith cannot be resolved by resort to any simple formula. It can only be answered in the light of the totality of all the circumstances involved in a particular case. But among such circumstances, two factors would seem to be essential prerequisites to any finding that the employer raised the majority issue in good faith in cases in which a union had been certified. There must, first of all, have been some reasonable grounds for believing that the union had lost its majority status since its certification. And, secondly, the majority issue must *not* have been raised by the employer in a context of illegal antiunion activities . . . ." *Celanese Corp. of America*, 95 N. L. R. B. 664, 671–673 (1951).

The Board purported to be proceeding on the basis that *Celanese* was still the law, and thus that "the totality of all *[sic]* the circumstances" in the present case did not establish reasonable grounds for doubting majority status. The precise question presented is whether there was substantial evidence to support this factual finding. There plainly was not.

As described above, of the 49 employees in the bargaining unit at the time of respondent's refusal to bargain, a majority (25) were strike replacements, and another 5 were former employees who had crossed the union's picket line. It may well be doubtful whether the latter group could be thought to support the union, but it suffices to focus upon the 25 strike replacements, who must be thought to oppose the union if the Board's own policies are to be believed. There was a deep and inherent conflict between the interests of these employees and the interests of the union. As the Board's cases have explained:

> "Strike replacements can reasonably foresee that, if the union is successful, the strikers will return to work and the strike replacements will be out of a job. It is understandable that unions do not look with favor on persons who cross their picket lines and perform the work of strikers." *Leveld Wholesale, Inc.*, 218 N. L. R. B. 1344, 1350 (1975).

> "The Union had been bargaining agent for those discharged employees and there can be no question that the Union's loyalty lay with these employees. The interests of the discharged employees were diametrically opposed to those of the strike replacements. If the discharged employees returned to work, the strike replacements would lose their jobs." *Beacon Upholstery Co.*, 226 N. L. R. B. 1360, 1368 (1976) (footnote omitted).

The Board relies upon this reality of "diametrically opposed" interests as the basis for two of its rules: First, that an employer does not commit an unfair labor practice by refusing to negotiate with the incumbent union regarding the terms and conditions of the replacements' employment. See *Service Electric Co.*, 281 N. L. R. B. 633, 641 (1986). Second, that the union's duty of fair representation does not require it to negotiate in the best interests of the strike replacements regarding the terms and conditions of their employment—in other words, that the union may propose "negotiations leading to replacements being terminated to make way for returning strikers," *ibid.* See *id.*, at 639 ("[I]t is not logical to expect [the striking bargaining] representative to negotiate in the best interests of strike replacements during the pendency of a strike") (internal quotation omitted; citation omitted); *id.*, at 641 (even after the strike has ended, the "inherent conflict between the two groups remains" until the underlying contractual dispute has been resolved); *Leveld Wholesale, supra*, at 1350 ("It would be asking a great deal of any union to require it to negotiate in the best interests of strike replace-

ments during the pendency of a strike, where the strikers are on the picket line").

The respondent in this case, therefore, had an employee bargaining unit a majority of whose members (1) were not entitled to have their best interests considered by the complainant union, (2) would have been foolish to *expect* their best interests to be considered by that union, and indeed (3) in light of their status as breakers of that union's strike, would have been foolish not to expect their best interests to be subverted by that union wherever possible. There was, moreover, not a shred of affirmative evidence that any strike replacement supported, or had reason to support, the union. On those facts, any reasonable factfinder must conclude that the respondent possessed, not necessarily a certainty, but at least a reasonable, good-faith doubt, that the union did not have majority support. At least three Courts of Appeals have effectively agreed with this assessment, considering strike replacements as opposed to the union in reversing Board findings of no reasonable, good-faith doubt. See *Soule Glass & Glazing Co.* v. *NLRB*, 652 F. 2d 1055, 1110 (CA1 1981); *National Car Rental System, Inc.* v. *NLRB*, 594 F. 2d 1203, 1206–1207 (CA8 1979); *NLRB* v. *Randle-Eastern Ambulance Service, Inc.*, 584 F. 2d 720, 728–729 (CA5 1978).

In making its no-reasonable-doubt finding, the Board relied upon its decision in *Station KKHI*, which stated:

> "[T]he hiring of permanent replacements who cross a picket line, in itself, does not support an inference that the replacements repudiate the union as collective-bargaining representative. . . . In this regard, an employee may be forced to work for financial reasons, or may disapprove of the strike in question but still desire union representation and would support other union initiatives. The presumption of union disfavor is therefore not factually compelling." 284 N. L. R. B., at 1344 (footnotes omitted).

The Court finds this reasoning persuasive: "Economic concerns, for instance, may force a replacement employee to work for a struck employer even though he otherwise supports the union and wants the benefits of union representation." *Ante*, at 789. These responses are entirely inadequate. The question is not whether replacement employees accept employment for economic reasons. Undoubtedly they do—the same economic reasons that would lead them to oppose the union that will likely seek to terminate their employment. Nor is the question whether replacements would like to be represented by *a* union. Some perhaps would. But what the employer is required to have a good-faith doubt about is majority support, not for "union representation" in the abstract, but for representation *by this particular complainant union, at the time the employer withdrew recognition from the union.*

Also embarrassingly wide of the mark is the Court's observation that "[u]nions do not inevitably demand displacement of all strike replacements." *Ante*, at 790. It is not necessary to believe that unions *inevitably* demand displacement of *all* strike replacements in order to doubt (as any reasonable person must) that strike replacements support a union that is under no obligation to take their employment interests into account, and that is *almost certain* to demand displacement of as many strike replacements as is necessary to reinstate former employees. The Court does not accurately describe my position, therefore, when it suggests that I seek "to force the Board to apply a presumption based on the premise that unions *always* make such demands." *Ante*, at 793, n. 11. I seek to force the Board, as the APA requires, to give objectively reasonable probative effect to the reality (expressed in the Board's own opinions and made the basis for rules of law it has adopted) that unions *almost always* make such demands, and that replacement employees know that. That is enough to establish this employer's good-faith doubt.

The Court asserts that "the facts of this case" belie the proposition stated *supra*, at 808, that a union "is almost certain to demand the displacement of as many strike replacements as is necessary to reinstate former employees," because the union in this case "did not negotiate for the discharge of replacements as a condition for settling the strike." *Ante*, at 791, n. 9. That is not true, and even if it were true it would not be determinative of the issue here. According to the Board, this is what happened:

> "On 16 July the Union, *on behalf of the striking employees*, made an unconditional offer *to return to work*, thereby ending the strike. Later on the same day, the Union notified the Respondent that the bargaining unit employees had accepted the Respondent's 25 May collective-bargaining proposal." 287 N. L. R. B., at 351 (emphasis added).

Surely an offer "on behalf of the striking employees . . . to return to work" can only be accepted by allowing the striking employees to return to work. Does the Court really mean to interpret the union's action as agreement that the strike replacements shall stay on the job under the terms of the May 25 collective-bargaining proposal, and the strikers remain unemployed? Or as a proposal that the employer should double its work force, paying both the replacement workers and the returning strikers under the terms of the May 25 offer? Surely the very most that can be said is that the union's offer *left the status of the replacement workers for later negotiation.* No more is necessary to establish a reasonable doubt that the replacement workers would support the union—which, in any such negotiations, could be expected (indeed, would have a legal obligation) to seek displacement of the strikebreakers by the returning strikers. As the Board said in *Service Electric:*

> "[E]ven if the strike be deemed to have ended by virtue of the Union's announcement that it had been termi-

nated, there is no basis for concluding that the Union suddenly is better able 'to negotiate in the best interests of strike replacements,' *Leveld Wholesale,* . . . 218 NLRB 1344, than it previously had been able to do. The inherent conflict between the two groups remains." 281 N. L. R. B., at 641.

The Court mentions only as an afterthought the fundamental conflict of interests that is at the center of this case:

"Moreover, even if the interests of strikers and replacements conflict *during* the strike, those interests may converge *after* the strike, once job rights have been resolved. Thus, while the strike continues, a replacement worker whose job appears relatively secure might well want the union to continue to represent the unit regardless of the union's bargaining posture during the strike." *Ante,* at 792 (emphasis in original).

The trouble with this is that it posits a species of replacement worker that will rarely exist unless and until the union has agreed (as it had not in this case) to accept the replacements' employment status—*i. e.,* until "job rights have been resolved." How can there be "a replacement worker whose job appears relatively secure" when the employer agrees to negotiate in good faith with a union that will surely seek the reinstatement of all its strikers? Even a replacement worker who has clear seniority over other replacement workers, and who somehow knows (by what means I cannot imagine) that some of the striking workers no longer want their jobs back,[1] has no means of assurance that the union will do

---

[1] The Court emphasizes that "at the time of respondent's withdrawal of recognition from the Union, there were only 19 strikers and 25 replacements." *Ante,* at 792, n. 9. It is easy for the Court to know this, following a full-dress formal adjudication inquiring into the historical fact. One wonders how or why the replacement workers could be thought to have known it at the time. Surely the union did not advertise the fact that its strike force was dwindling, and it is unlikely that the strikebreakers learned it from the remaining strikers in the course of routine frater-

him the favor of bargaining for the employer to honor his seniority among strikebreakers. It seems overwhelmingly likely that the union will want its returning members to have their old jobs back, or better jobs, regardless of the relative seniority of the strikebreakers who would thereby be displaced. I do not dispute that "replacement workers are capable of looking past the strike in considering whether or not they desire representation by the union," *ibid.*—in the same way that a man who is offered $1 million to jump off a cliff is capable of looking past the probable consequence of his performance to contemplate how much fun he would have with $1 million if he should survive. Surely the benefits strike replacements anticipate from their poststrike representation by *this particular union* must be expected to weigh much less heavily in their calculus than the reality that if *this particular union* does the bargaining and gets its way, they will not have poststrike jobs.

The Court's only response to this is that the union's ability to achieve displacement of the strike replacements will depend upon its bargaining power. Its bargaining power could conceivably be so weak, and a strike replacement might conceivably so prefer *this* union over other alternatives, that he would be willing to take the chance that the union will try to oust him. *Ante*, at 790–791. I suppose so. It might also be that one of the strike replacements hopes the union will continue as the bargaining representative because, as the employer knows, the union president is his son-in-law. The Board Counsel is entirely free to introduce such special circumstances. But unless they appear in the record, the reasonableness of the employer's doubt must be determined on the basis of how a reasonable person would assess the probabilities—and it is overwhelmingly improbable that a

---

nization. Perhaps they knew, but they most probably did not; and whether the employer's doubt about replacement support for the union was reasonable depends, of course, upon whether he reasonably assessed the probabilities.

strikebreaking replacement so much prefers the incumbent union to some other union, or to no union at all, that he will bet his job the union is not strong enough to replace him. The wager is particularly bad because it is so unnecessary, since he and his fellow replacements could achieve the same objective, without risking their jobs in the least, by simply voting for that union, after the strike is over, in a new certification election.

I reiterate that the burden upon the employer here was not to demonstrate 100% assurance that a majority of the bargaining unit did not support the union, but merely "reasonable doubt" that they did so. It seems to me absurd to deny that it sustained that burden.

## III

The Court never directly addresses the question whether there was substantial evidence to support the Board's conclusion that respondent had not established a reasonable good-faith doubt of the union's majority status. Indeed, it asserts that that question is not even at issue, since "[t]he question on which we granted the Board's petition for certiorari is whether, in *assessing* whether a particular employer possessed a good-faith doubt, the Board must adopt a general presumption of replacement opposition to the union." *Ante,* at 778, n. 2. That is the equivalent of characterizing the appeal of a criminal conviction, in which the defendant asserts that the indictment should have been dismissed because all the evidence demonstrated that he was not at the scene of the crime, as involving, not the adequacy of the evidence, but rather the question whether the jury was required to adopt the general presumption that a person cannot be in two places at the same time. No more in administrative law than in criminal law is the underlying question altered by characterizing factual probabilities as presumptions. The two are one and the same. The only reason respondent asserts, and the Fifth Circuit held, that the Board *had* to adopt the "pre-

sumption" of replacement opposition to the union (I place the word in quotation marks because, as I shall describe, that terminology is misleading) is that to refuse to apply that "presumption" for the reason the Board gave (viz., that it is not in fact an accurate assessment of probabilities) is to deny evidence its inherently probative effect, and thus to produce a decision that is not supported by substantial evidence. The Board's framing of the question presented, like its opinion in this case, invites us to confuse factfinding with policymaking. The Court should not so readily have accepted the invitation.

Prior to its decision in *Station KKHI*, the Board well understood the inevitable logic set forth in Part II above, and had held that an employer has an objectively reasonable basis for doubting the union's majority status when the majority of employees in the bargaining unit are permanent replacements, and there is no other indication regarding the replacements' sentiments toward the union. See *Beacon Upholstery Co.*, 226 N. L. R. B., at 1368; *Titan Metal Mfg. Co.*, 135 N. L. R. B. 196, 215 (1962); *Stoner Rubber Co.*, 123 N. L. R. B., at 1445. In a case called *Cutten Supermarket*, 220 N. L. R. B. 507 (1975), the Board departed, in dictum, from this well-established precedent. There, as the Board describes the case in *Station KKHI*, 284 N. L. R. B., at 1341, the Board "inexplicably stated," with respect to strike replacements: "[I]t is a well-settled principle that new employees are presumed to support the union in the same ratio as those whom they have replaced." 220 N. L. R. B., at 509. This dictum became a Board holding in *Pennco, Inc.*, 250 N. L. R. B. 716 (1980), where the Board stated: "The Board has long held that [the presumption of strike replacement support for the union] *applies as a matter of law,* and it is incumbent upon Respondent to rebut it even, and perhaps especially, in the event of a strike." *Id.,* at 717 (emphasis added). As the Board acknowledged in *Station KKHI:*

> "The Board in *Pennco* cited no cases in support of its assertion that the presumption in question was 'long held.' Indeed, . . . this presumption was not 'long held' at all, but in fact was not articulated in any fashion until *Cutten Supermarket* in 1975, only 5 years prior to *Pennco*, and even then (*i. e.*, in *Cutten*) in dictum and without supporting rationale or precedent." 284 N. L. R. B., at 1343.

Unsurprisingly, given the feeble support for this presumption, the Courts of Appeals (I am still repeating the account in *Station KKHI*) "uniformly rejected it." *Ibid.*

In *Station KKHI*, which is the case that established the framework of reasoning for the decision we review today, the principal issue before the Board was the *Pennco* presumption of replacement support for the union. See 284 N. L. R. B., at 1340. The Board abandoned it. See *id.*, at 1344. The Board went further, however, and here is the error that infects the present opinion:

> "On the other hand, we find the contrary presumption equally unsupportable. Thus, the hiring of permanent replacements who cross a picket line, in itself, does not support an inference that the replacements repudiate the union as collective-bargaining representative." *Ibid.*

The mistake here is to treat as equivalent elements of decisionmaking, the presumption that strike replacements *do* support the union, and the evidentiary inference that strike replacements do *not* support the union. They are not different applications of the same device, and it does not display a commitment to be governed only by the "real facts" to reject both the one and the other. The former was applied "as a matter of law," *Pennco, supra*, at 717, and not as the product of inference, which is "[a] process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved or admitted." Black's Law Dictionary 700 (5th ed.

1979). One can refer to the product of an inference as a presumption: If one knows the identity of the sole Englishman in a certain remote part of Africa, and encounters there a white man in pith helmet sipping a gin and tonic, it is perfectly appropriate to say "Dr. Livingston, I presume." But that sort of presumption, which the text writers used to call "presumption of fact," see 9 J. Wigmore, Evidence § 2491, p. 304 (J. Chadbourn rev. ed. 1981), is quite different from the *Pennco*-type "presumption of law" insofar as concerns both agency power and judicial review, as I shall proceed to explain.

It is the proper business of the Board, as of most agencies, to deal in both presumptions (*i. e.*, presumptions of law) and inferences (presumptions of fact). The former it may create and apply *in the teeth of the facts*, as means of implementing authorized law or policy in the course of adjudication. An example is the virtually irrebuttable presumption of majority support for the union during the year following the union's certification by the Board, *Station KKHI*, 284 N. L. R. B., at 1340. The latter, however—inferences (or presumptions of fact)—are not creatures of the Board but its masters, representing the dictates of reason and logic that must be applied in making adjudicatory factual determinations. Whenever an agency's action is reversed in court for lack of "substantial evidence," the reason is that the agency has ignored inferences that reasonably must be drawn, or has drawn inferences that reasonably cannot be. As I have discussed above, that is what happened here.[2]

---

[2] The Court apparently believes that it is all right for the Board to ignore proper factfinding now, so long as it promises to make proper factfinding later. The Court says that "assuming for the sake of argument that . . . unions 'almost certain[ly]' demand displacement of all strike replacements . . . , such demands will be a factor in the Board's analysis in most cases. There is no reason, however, to force the Board to apply a presumption based on the premise that unions *always* make such demands . . . ." *Ante*, at 793, n. 11. This presumably means that when the respondent, having been compelled by the Board to negotiate with this

Of course the Board may choose to implement authorized law or policy in adjudication by *forbidding* a *rational* inference, just as it may do so by *requiring* a *nonrational* one (which is what a presumption of law is). And perhaps it could lawfully have reached the outcome it did here in that fashion—saying that *even though* it must reasonably be inferred that an employer has good-faith doubt of majority status when more than half of the bargaining unit are strike replacements whose job rights have not been resolved, we will not permit that inference to be made. (This would produce an effect close to a rule of law eliminating the good-faith doubt defense except for cases in which the employer can demonstrate, by employee statements, lack of support for the union.) But that is not what the agency did here. It relied on the reasoning of *Station KKHI*, which rested upon the conclusion that, *as a matter of logic and reasoning*, "the hiring of permanent replacements who cross a picket line, in itself, does not support an inference that the replacements repudiate the union as collective-bargaining representative." *Id.*, at 1344. That is simply false. It is bad factfinding, and must be reversed under the "substantial evidence" test.

It is true that *Station KKHI* added, seemingly as a makeweight: "Moreover, adoption of this presumption would disrupt the balance of competing economic weapons long established in strike situations and substantially impair the employees' right to strike by adding to the risk of replacement the risk of loss of the bargaining representative as soon as replacements equal in number to the strikers are willing to cross the picket line." *Ibid.* There are several reasons why

---

union, is presented with a proposal for displacement of strike replacements, it may *then* break off negotiations on the grounds that it has a good-faith doubt of the union's majority status. I doubt very much that this is what the Board has in mind. But even if it is, it does not justify the Board's compelling the respondent to negotiate in the first place, when any reasonable person must have entertained a "reasonable doubt" of the union's majority status—which the Board continues to affirm is enough.

we cannot allow this seeming policy justification to suffice for sustaining the agency's action.

First of all, it is set forth as a reason for not adopting a counterfactual presumption, rather than (what would have been necessary to validate the agency's action) a reason for ignoring legitimate factual inferences. It is one thing to say: "The facts do not support conclusion X, and we decline to impose conclusion X as a matter of law, since that would have adverse policy consequences." It is quite another thing to say: "Even though the facts require conclusion X, we reject it for policy reasons." The former is what the Board has said here, and the latter is what it would have to say to support its decision properly on policy grounds. The agency has set forth a reason for *rejecting* the suggestion that it ignore the facts; having found that, on the record, the facts were the opposite of what the agency believed (*i. e.*, there was reasonable good-faith doubt), we have no idea whether the agency would regard the same reason as adequate basis for now *accepting* a suggestion that it ignore the facts. Under long-established principles of judicial review, we cannot make that yet-to-be-made decision on the agency's behalf, but must remand so that the Board may do so. *SEC* v. *Chenery Corp.*, 318 U. S. 80, 88 (1943).

Second, by upholding as a counterfactual policy determination a ruling that was made, and defended before the Fifth Circuit, as ordinary factfinding plus the refusal to adopt a counterfactual policy determination, we would be depriving respondent of possible legal defenses that it had no occasion to present to the courts. Section 8(a)(5) of the NLRA is violated only if the employer refuses to bargain "with the representatives" of his employees. 29 U. S. C. § 158(a)(5). The Act does not define the term "representatives," except to say that it "includes any individual or labor organization." § 152 (4). Specifically, it does not say or anywhere suggest that a certified union is the "representative" for purposes of § 158(a)(5) unless and until it is decertified. Because the Board has

long acknowledged the good-faith doubt defense, there has been no occasion to test in the courts the proposition that the employer can be liable for refusing to bargain with a certified union that patently does *not* have majority support. The only presumption of law that is applied to effect a policy exception to this defense—the almost irrebuttable presumption of union support for one year after its certification—is arguably authorized as an implementation of the policy of § 159(e)(2), which precludes certification elections more frequently than annually. Even if, moreover, the Board can generally require the employer to bargain with a union that is not a "representative" in the sense of having majority support, there is the further question whether it can require him to bargain with a union that is a "representative" *neither* in that sense *nor* in the sense that it is obligated to bargain in the best interests of the majority of employees. See my earlier discussion of the Board's rule that the union has no duty to represent the interest of replacement employees, *supra,* at 806–807. The Board did not have to confront these issues in the present case, because it did not purport to be deciding the case on the assumption that the union lacked majority support. It found respondent guilty of an unfair labor practice on the ground that there was, *in fact,* no reasonable doubt of the union's majority status; and it is exclusively *that* finding which respondent challenged, both here and in the Fifth Circuit. If we permitted the Board's order to be enforced on the quite different ground that it does not matter whether respondent had a reasonable, good-faith doubt, we not only would be making for the Board a decision it has not yet reached, but also would be depriving respondent of judicial review of that decision.[3]

---

[3] The Court says that it "need not determine whether the Board's policy considerations *alone* would justify its refusal to adopt the presumption urged by respondent, because we find the Board's decision not irrational as a factual matter." *Ante,* at 795–796, n. 13. For the reasons just discussed in text, the Board's policy considerations *alone* could not possibly be

*    *    *

Despite the fact that the NLRB has explicit rulemaking authority, see § 156, it has chosen—unlike any other major agency of the Federal Government—to make almost all its policy through adjudication. It is entitled to do that, see *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 294–295 (1974), but it is not entitled to disguise policymaking as factfinding, and thereby to escape the legal and political limitations to which policymaking is subject. Thus, when the Board purports to find no good-faith doubt because the facts do not establish it, the question for review is whether there is substantial evidence to support that determination. Here there is not, and the Board's order should not be enforced.

What the Court has permitted the Board to accomplish in this case recalls Chief Justice Hughes' description of the unscrupulous administrator's prayer: " 'Let me find the facts for the people of my country, and I care little who lays down the general principles.' " Address before Federal Bar Association, February 12, 1931, quoted by Frank, J., in *United States* v. *Forness*, 125 F. 2d 928, 942 (CA2 1942), reprinted in 13 The Owl of Sigma Nu Phi 9, 12 (Feb. 1931). I respectfully dissent.

---

held to have justified the refusal in the present case. The Court's statement does make perfectly clear, however, that today's judgment ultimately rests upon the determination that it was "not irrational as a factual matter" for the Board to deny on the present record that respondent had a reasonable, good-faith doubt. That determination is simply not credible.