**JOHNS–MANVILLE SALES CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 88–2134.

United States Court of Appeals, Tenth Circuit.

June 26, 1990.

William J. Rodgers (Thomas G. Olp, Ross & Hardies, Washington, D.C., with him on the brief), Ross & Hardies, for petitioner.

David A. Fleischer, Supervisory Atty. (Howard E. Perlstein, Rosemary M. Collyer, Gen. Counsel, Robert E. Allen, Jr., Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, with him on the brief), N.L.R.B., Washington, D.C., for respondent.

Before McKAY, MOORE, and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Johns–Manville Sales Corporation ("Manville") petitions for review of a decision of the National Labor Relations Board (the "Board") finding that Manville violated Sections 8(a)(1) and 8(a)(5) of the Labor Management Relations Act. 29 U.S.C. § 158(a). The Board concluded that Manville withdrew its recognition of a previously certified union without reasonable grounds to doubt the union's majority status. *Johns–Manville Sales Corp.*, 289 N.L.R.B. No. 40 (June 27, 1988).[1] The Board seeks enforcement of its order.

## Background

The Machinists District Lodge 115, Local Lodge 1549 ("Union") became the bargaining representative of the production and maintenance employees at Manville's Stockton, California pipe manufacturing plant in 1958. On April 12, 1981, the latest contract between Manville and the Union expired and the Stockton employees went out on strike. Manville quickly hired permanent replacements and continued to operate the facility. By May 10, 1981, the employee pool consisted of roughly 509 employees: 230 strikers, 267 replacements, and 12 others[2] who crossed the picket lines.

---

1. An additional charge levelled against Manville concerned a demand for vacation pay on behalf of certain unit employees. This charge was dismissed by the Board and is not before us on appeal.

2. The remaining twelve workers consisted of union members who refused to honor the strike

Throughout its duration, the strike was permeated by intolerable levels of violence and hostility toward the non-striking workers and replacement job applicants. The Board itself characterized the situation as follows:

> During the first 4–5 months of the strike, strikers harassed job applicants and new employees as they crossed the picket line; strikers temporarily blocked their cars, shouted at them, made obscene gestures, and called them 'scabs.' In addition, a dummy with the word 'scab' on its chest was hanged by its neck near the plant entrance. At least 70 cars owned by employees sustained some combination of smashed windows, slashed tires, or body damage. Most of this vandalism occurred while the cars were parked on the [employer's] premises. The home of one employee was burglarized, the word 'scab' written on the wall, and furniture stolen. [Manville] paid employees over $20,000 in compensation for damages related to the strike.

*Johns–Manville*, 289 N.L.R.B. No. 40, slip op. at 6. Additional undisputed evidence indicates that strikers assaulted applicants for replacement positions by throwing objects such as steel balls at them, that one former striker who returned to work reported his home had been "shotgunned," and that strikers constantly yelled thinly veiled threats at applicants and replacements, such as "I know where you live." Manville offered proof of over 110 reported incidents of violence and property damage known by it to have been directed at replacements.[3] The evidence reveals that at least some violent incidents occurred with the knowledge and participation of Union officials.

After repeated negotiating sessions between Manville and the Union, the job status of the replacements became the only real point of contention preventing the parties from reaching an accord. The Union offered to accept Manville's earlier proposal on the sole condition that the replacements be fired in adequate numbers to accommodate returning strikers who would resume their previous positions with seniority intact. Manville rejected this offer and informed the replacements of the Union's demand.

In a period of less than a week, from April 30 to May 5, 1981, the replacements gathered 211 signatures, more than the number of signatures necessary to force an election, on a decertification petition which they filed with the Board.[4] At every new employee orientation meeting, replacements openly asked their supervisors how they could depose the Union.[5] Supervisors reported "overwhelming sentiment" among the replacements opposing the Union. Manville identified 13 employees whose names did not appear on the decertification petition who had stated in conversations with their supervisors that they did not want the Union as their bargaining representative. Seven returning strikers, four of whom had not signed the petition, tendered their resignations from the Union.[6]

At a hearing before the Board on August 26, 1981 concerning the decertification petition, Manville informed the Union that it would "decline to recognize [the Union] until and unless they are certified in an NLRB proceeding." The Board eventually scheduled a decertification election for No-

and employees who were previously laid off but were recalled after the strike began.

**3.** Although the ALJ rejected Manville's offer of proof, the Board's decision expressly notes that the additional proof would be inadequate, in any case, to alter its conclusions. *Johns–Manville*, slip op. at 11 n. 8. The Board obviously considered this evidence and rejected it; we are therefore free to consider it as well.

**4.** Seven of the 211 signatures were eventually found to be illegible and could not be authenticated.

**5.** Although thirty to forty such questions were asked in meetings before the assembled employees, supervisors could not identify which specific employees raised the questions.

**6.** The Board disregarded these resignations because only one employee expressly cited opposition to the Union as the reason for resigning, and that employee had also signed the petition. Two of the resigning employees signed the decertification petition but did not list union dissatisfaction as their motivation for leaving the Union.

vember 1981 but the election was never held due to the Union's intervening charges of unfair labor practices which form the basis for this case.[7]

The essence of the Union's allegation, and the gist of the Board's decision is that Manville had no legal grounds to generally withdraw recognition from the Union when it did. Both sides concede that under the Board's regulatory framework in effect at the time, Manville was correct in refusing to engage in further contract negotiations with the Union once the decertification petition had been filed. *See Johns–Manville*, 289 N.L.R.B. No. 40, slip op. at 8 (citing *Telautograph Corporation*, 199 NLRB 892 (1972), *rev'd prospectively, Dresser Industries, Inc.*, 264 NLRB 1088 (1982)); Brief for NLRB at 9.[8] However, the Board found that Manville also withdrew recognition and refused to deal with the Union on matters unrelated to contract negotiation, thereby violating the Act.[9] Manville petitions this court for review of the Board's decision, contending that the withdrawal was legally justified under the circumstances.

## Discussion

Manville's conduct in withdrawing recognition from the Union was justified if, at the time of withdrawal, either "(1) the union did not *in fact* enjoy majority support, or (2) [Manville] had a *'good faith' doubt*, founded on a sufficient objective basis, of the union's majority support." *NLRB v. Curtin Matheson Scientific, Inc.,* — U.S. —, —, 110 S.Ct. 1542, 1545, 108 L.Ed.2d 801 (1990) (second emphasis added) (quoting *Station KKHI*, 284 N.L.R.B. 1339 (1987), *enf'd,* 891 F.2d 230 (9th Cir.1989)); *see NLRB v. King Radio Corp.,* 510 F.2d 1154, 1156 (10th Cir.1975). Good faith doubt is the ground invoked here.

 To avail itself of the good faith doubt defense, an employer must produce " 'some objective evidence to substantiate his doubt of continuing majority status.' "[10] *Curtin Matheson*, 110 S.Ct. at 1550 (quoting *Curtin Matheson Scientific, Inc. v. NLRB*, 859 F.2d 362, 370 (5th Cir. 1988) (Williams, J., dissenting)); *see NLRB v. King*, 510 F.2d at 1156 (employer "must show a rational basis in fact for [its] doubt"). Whether the evidence demonstrates a sufficient basis to doubt the union's status must be determined in light of the totality of the circumstances in each case. *See Station KKHI*, 284 N.L.R.B. 1339, 1344 (1987) (Board will determine strike replacements' union sentiments on a case-by-case basis); *Celanese Corp. of*

---

**7.** In effect, an election which would have determined quickly and decisively the Union's actual majority status or lack thereof has been delayed almost nine years in order for an ALJ, the NLRB, and now this court to deliberate as to whether the Union enjoyed such status, and if so, whether Manville had reason to doubt it.

**8.** The Board noted that its decision in *Dresser Industries*, 264 N.L.R.B. 1088 (1982) overruled *Telautograph*, but that *Dresser* has been applied prospectively only. *Johns–Manville*, 289 N.L.R.B. No. 40, slip op. at 8 n. 5.

**9.** The Board found that the filing of a decertification petition did not excuse Manville from continuing to deal with the Union on matters of contract administration. Specifically, the Board found that Manville refused to provide employee medical information requested by the Union pursuant to state OSHA regulations, and failed to reply in any way to a demand by the Union on behalf of the unit employees for vacation pay allegedly accrued in 1981. Manville attacks the conclusion of the Board, contending

that it had no duty under the Act to provide the requested information or to respond to the demands concerning vacation pay. Because we base our decision on different grounds, we do not reach Manville's contentions in this regard.

**10.** Manville initially argued that it was entitled to question the Union's majority support based solely on the fact that striker replacements constituted a majority of the unit employees. The Supreme Court has recently upheld the Board in rejecting this approach, grounded as it is on a strictly legal presumption that striker replacements oppose the union. *Curtin Matheson*, 110 S.Ct. at 1551–54. Thus Manville cannot base its good faith doubt of the Union's majority on the mere numerical superiority of replacements. We emphasize, however, that the facts before the Court in *Curtin Matheson* were very different from the facts in this case. The Court was careful to document the lack of any strike-related violence or threats, and the absence of any demand that replacements be discharged. *Id.* at 1545–47. Likewise, no decertification petition had been filed by the replacements in *Curtin*.

*Am.*, 95 N.L.R.B. at 673 ("By its very nature, the issue of whether an employer has questioned a union's majority in good faith cannot be resolved by resort to any simple formula. It can only be answered in the light of the totality of all the circumstances involved in a particular case.").

In this case the Board articulated then misapplied these principles. It erred in two related ways. The Board impermissibly limited the means by which the employer could establish "good faith doubt", by essentially requiring proof of express anti-union statements by each individual worker comprising a majority of the bargaining unit. And, the Board did not weigh the cumulative effect of all the evidence; that is, it did not evaluate good faith doubt under the totality of the circumstances.

*Express Statements by Employees.*

■■■ Thirty percent of the employees in a bargaining unit can force an election by signing a decertification petition. *See, e.g., Skyline Corp. v. NLRB*, 613 F.2d 1328 (5th Cir.1980). Within a few days replacement workers at Manville gathered 211 signatures on such a petition, far exceeding the minimum number required. In its good faith doubt analysis, the Board became preoccupied with the fact that 211 (less 7 signatures which were illegible) did not constitute an absolute majority (around 254) of the bargaining unit, and that Manville proved individual anti-union statements by only a dozen or so additional specifically identified employees—still short of an absolute majority. Although the board went through the motions of evaluating separate factors present in the circumstances of this strike, its preoccupation with a head count requirement is evident. It stated that it

> will review each case on its facts considering whether the employer has proferred evidence of employees' *expressed desires* to repudiate the union sufficient to overcome the overall presumption of continuing union majority.

Turning to the facts here, the record falls short of supporting the Respondent's affirmative defense *in that it establishes only that prior to August 26*

the Respondent was aware that, at most, 217 employees out of a combined total of approximately 509 strike replacements, returning strikers, and strikers had repudiated the union.

*Johns–Manville*, 289 N.L.R.B. No. 40, slip op. at 9–10 (emphasis added).

Thus, in evaluating the effect of violence by strikers against non-strikers, the Board first down-played the violence, without drawing any conclusion as to whether or not it constituted "some ... evidence" of union non-support, *Curtin Matheson*, 110 S.Ct. at 1550, then said

> *More importantly* given the crucial significance of the Respondent's decision to withdraw recognition, we note that the Respondent here had available other, *more reliable* factors, *including the list for the decertification petition and the statements from identified employees, which could have indicated more tangibly majority employee dissatisfaction with the union....*

*Johns–Manville*, 289 N.L.R.B. No. 40, slip op. at 11–12 (emphasis added).

Referring directly to the Board's opinion in this case, Chief Justice Rehnquist in his concurring opinion in *Curtin*, 110 S.Ct. at 1554–55, remarked that "some recent decisions suggest that [the Board] now requires an employer to show that individual employees have 'expressed desires' to repudiate the incumbent union in order to establish a reasonable doubt of the union's majority status." Our reading of the Board's decision in this case convinces us that, as a practical matter, the Board did impose such a requirement, or at least limited its consideration of the evidence because of the importance it attached to such a view. We are equally convinced that there is no legal support for that position. In fact, it is inconsistent with the statement of governing principles which the Board recited and purported to rely upon in this case, all of which are set forth above; and it is inconsistent with the rule in this circuit.[11] *See N.L.R.B. v. King*, 510 F.2d at 1156.

Furthermore, by requiring direct proof of employee dissatisfaction, the Board limits the availability of the good faith doubt

---

**11.** The Board's approach in this case effectively

eliminated Manville's hiring of replacement

defense to instances where dissatisfied employees come forward and identify themselves in sufficient numbers to constitute an absolute majority. Such an approach leaves little if anything of the good faith doubt rule, effectively collapsing it into the proof in fact rule.[12] *See Station KKHI*, 284 N.L.R.B. at 1344–45; *Celanese Corp. of Am.*, 95 N.L.R.B. 664, 672 (1951).

Finally, such a requirement would be nearly impossible to satisfy in view of the Board's rules which prevent the employer from polling its employees unless it *first* establishes a good faith doubt of majority status. Chief Justice Rehnquist stated:

> It appears that another of the Board's rules prevents the employer from polling its employees unless it first establishes a good-faith doubt of majority status. *See Texas Petrochemicals Corp.*, 296 N.L.R.B. No. 136 (1989) (slip op., at 10) (the standard for employer polling is the same as the standard for withdrawal of recognition). I have considerable doubt whether the Board may insist that good-faith doubt be determined only on the basis of sentiments of individual employees, and at the same time bar the employer from using what might be the only effective means of determining those sentiments.

*Curtin Matheson*, 110 S.Ct. at 1555 (concurring opinion). Echoing that same sentiment, Justice Blackmun in his dissent in *Curtin* stated:

> I am also troubled by the fact, noted in the CHIEF JUSTICE's concurring opinion ..., that while the Board appears to require that good-faith doubt be established by express avowals of individual employees, other Board policies make it practically impossible for the employer to amass direct evidence of its workers' views.

We conclude that the Board erred as a matter of law in its reliance in this case, at least partially, upon a requirement that good-faith doubt must be established by the express statements of individual workers.

*Totality of the Circumstances.*

■■■ Although the Board purported to assess several separate factors advanced by Manville as evidence supporting its good-faith doubt of majority union support, it did not give full weight to the evidence because of its emphasis upon express statements by individual employees; and, the Board failed entirely to assess the cumulative weight of all of the factors under a totality of the circumstances standard.

Responding to Manville's contentions, the Board acknowledged at least six "objective factors" which tended to infer nonmajority union support. These factors included: the hiring of replacement workers; pervasive strike violence; the decertification petition containing 211 signatures; numerous comments by replacements to plant management disparaging the union and rejecting union representation; union resignations by 7 non-strikers; the Union's sole

---

workers as a factor to be considered in conjunction with other factors such as violence directed against the replacements or union demands that the replacements be fired, which was the case here. That is tantamount to presuming that the replacement workers favor the union, and permitting the presumption to be rebutted only by express statements of individual workers. *See Station KKHI*, 284 N.L.R.B. at 1344 ("We can find no basis for presuming that strike replacements ... favor union representation."). In this regard, we note in passing Justice Scalia's reasoning that "'replacement workers are capable of looking past the strike in considering whether or not they desire representation by the union' ... in the same way that a man who is offered one million dollars to jump off a cliff is capable of looking past the probable consequences of his [landing]....'" *Curtin Matheson*, 110 S.Ct. at 1562 (Scalia, J., dissenting).

**12.** The Supreme Court "has never held that the Board is required by statute to recognize the good-faith doubt defense, and the Board's power to eliminate that defense remains an open question." *Curtin Matheson*, 110 S.Ct. at 1557 (Blackmun, J., dissenting). Just as in *Curtin Matheson*, the Board in this case does not purport to eliminate the good faith doubt defense; therefore, we do not address the Board's power to do so. *See id.* at 1556 n. 2 (Blackmun, J., dissenting) ("'[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.'") (quoting *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)).

remaining contract demand for striker reinstatement and discharge of replacements; and the Union's lack of attempts to organize the replacements.[13] However the Board made no assessment of the combined effect of these factors.[14] Moreover, the Board identifies no evidence whatsoever which shows union support among the nonstrikers and, in fact, no such evidence was offered at the hearing.

Under the totality of the specific circumstances of this case, we conclude that the evidence can only support one conclusion: Manville had sufficient objective evidence before it to doubt, in good faith, that the Union continued to enjoy majority support. *Cf. Burns Int'l Sec. Serv. Inc. v. NLRB*, 567 F.2d 945, 947–49 (10th Cir.1977).

### Conclusion

For the reasons set out above, the Board's decision in this case is not supported by substantial evidence in the record as a whole. *Lear Siegler, Inc. v. NLRB*, 890 F.2d 1573, 1575 (10th Cir.1989). Manville was legally justified, based on the objective manifestations of lack of majority support, in withdrawing recognition from the Union. Accordingly, we refuse to enforce the Board's order.

**ENFORCEMENT DENIED.**

---

**13.** Although the Board noted Manville's duty to refrain from bargaining with the Union pending the upcoming decertification election, it did not consider the impact of the scheduled election on the total circumstances surrounding Manville's withdrawal of recognition.

**14.** It is settled, with respect to some of the individual factors, that Manville could not presume a lack of majority support from those individual facts alone. *See, e.g., Curtin Matheson Scientific, Inc.*, 110 S.Ct. at 1551–55 (no presumption from mere hiring of replacements). It may be that non-striking employees may in fact support the union in some situations. *See generally W & W Steel Co. v. NLRB*, 599 F.2d 934, 941 (10th Cir.1979) (McKay, J., dissenting):

Reasons for not joining in a strike other than because of displeasure with a union are numerous. An employee might not participate in a strike because he fears loss of employment or loss of wages, or because he does not believe a particular strike is appropriate; he might nonetheless favor the union's representation.

*But see also, id.* at 941 n. 3 (McKay, J., dissenting):

[T]he Board may [not] have it both ways on this point.... [E]vidence of majority participation in a strike does not in the least indicate majority support for the union. Reasons for striking are as multifaceted as reasons for not striking. An employee may oppose continued representation by a particular union, but nonetheless go on strike as a result of intimidation or social pressure, or because he happens to agree with the goals a strike is designed to achieve.

Nevertheless, it strains reason to ignore the increasingly convincing inference which arises when all of these individual factors are simultaneously present.