COASTAL DERBY REFINING COMPANY, formerly known as Derby Refining Company, Petitioner/Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,

Oil, Chemical & Atomic Workers International Union (AFL–CIO), Local 5–241, Intervenor.

No. 89–9514.

United States Court of Appeals, Tenth Circuit.

Oct. 4, 1990.

Robert C. DeMoss, Houston, Tex., for petitioner/cross-respondent.

Paul Hitterman, Atty. (Joseph E. Desio, Acting Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Charles Donnelly, Supervisory Atty., and Nancy B. Hunt, Attorney, on the brief), N.L.R.B., Washington, D.C., for respondent/cross-petitioner.

Donald J. Mares of McKendree, Toll & Mares; and John W. McKendree, Gen. Counsel, Oil Chemical and Atomic Workers Intern. Union, AFL–CIO, Denver, Colo., filed a brief for intervenor.

Before SEYMOUR, ANDERSON and BRORBY, Circuit Judges.

SEYMOUR, Circuit Judge.

Coastal Derby Refining Company has filed a petition for review in which it challenges the National Labor Relations Board's decision. The Board held that Coastal Derby violated sections 8(a)(5) and (1) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1) and (a)(5) (1988), and ordered Coastal Derby to bargain collectively with the Oil, Chemical and Atomic Workers International Union upon request. The Board has filed a cross-peti-

tion for enforcement of the order in which it argues that substantial evidence supports the finding that Coastal Derby was a successor employer and thus obligated to recognize and bargain collectively with the Union. We agree with the Board and, accordingly, deny the petition for review and grant the petition for enforcement of the order.

## I.

Since about 1942, various companies have operated an oil refinery located in El Dorado, Kansas. The Oil, Chemical and Atomic Workers International Union, Local 5–241, became the collective bargaining representative for the refinery employees in the 1940s and continued to represent them during the time Pester Corporation owned and operated the refinery, from 1977 until 1986. The refinery processed and refined crude oil into gasoline, fuel oils, asphalt, and similar products.

Pester employed 138 production and maintenance unit workers. It began experiencing financial difficulties in late 1984, and advised the Union in early 1985 that it would have to curtail operations because of its financial problems and its inability to buy crude oil. On February 25, 1985, Pester filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. On March 5, Pester's refinery manager, Randy Newcomer, held a meeting with unit employees in the lunchroom and read an announcement which described the company's precarious financial situation and stated that Pester would have to reduce the work force immediately. The announcement also stated that Pester "encourage[s] those who are laid off to evaluate all job opportunities in light of the current economic conditions and stress[es] the uncertainty of those opportunities with Pester Refining." Rec., vol. II, R. exh. 5. Of the 138 unit employees, Pester let go all but forty-three on that day.[1] Most of these employees were laid off, but Pester told several employees that if they retired prior to being laid off, they would receive a significantly greater proportion of their pension. Three employees took Pester's advice; two retired effective April 1, 1985, and one retired effective November 1, 1985.

The Union and Pester met on March 11 to discuss the recent events. The Union agreed that it would not seek to enforce certain provisions of the existing collective bargaining agreement in order to facilitate Pester's attempt to reorganize successfully. Due to the shutdown of another operations division, however, the layoffs continued. On April 13, Pester had only twenty-two unit employees on its payroll. During this time, Pester attempted unsuccessfully to negotiate processing agreements to enable reactivation. In June, Pester finally was able to secure agreements with Coastal Derby and another company to process certain products owned by the companies. Pester then recalled a number of employees[2] from among those who had been laid off. Four employees refused recall because, as two testified, they were already employed full-time. One of the laid-off employees testified that he declined because Pester offered him only a two-week recall while he was working on a six-month long job that the Union had found for him in Montana, and it was impracticable for him to leave Montana for such a short-lived job in Kansas. See rec., vol. I, at 103–06. Another employee testified that he had gotten a full-time job and was apprehensive about leaving it for a job that might only last a couple of months. See id. at 155–56. The names of these employees were then removed from the recall list and the four were terminated.

Beginning in the fall of 1985, Pester and the Union entered into negotiations over a reorganization plan for the company which would enable it to reopen the refinery on a seasonal basis. The Union agreed in November to a freeze of the pension plan, and

---

**1.** Pester continued to blend and sell asphalt since it had an asphalt inventory, and, for a short time, to run some high-octane fuel products, but it was forced to halt the processing of crude oil.

**2.** Pester's unit employees jumped from 22 to 43 in late September, and then fluctuated between 23 and 33 until the transfer to Coastal Derby.

Pester agreed in December to conduct its employee recall on a seniority basis and to extend recall rights through March 15, 1987. Pester and Coastal Derby also began discussing a possible exchange of assets. In February, Pester submitted to the bankruptcy court an asset exchange plan, under which Coastal Derby received the El Dorado refinery. The bankruptcy court approved the plan, whereupon Coastal Derby began a recruitment drive to staff the refinery. Coastal Derby invited former Pester employees to apply for jobs, *see id.* at 80, and it ran newspaper advertisements. Meanwhile, Pester continued to operate the refinery on a limited basis from February until April 10, 1986, when Coastal Derby took over the operations. The refinery never completely shut down.

When Coastal Derby assumed ownership of the refinery, it continued to operate the same departments and operations as had Pester, and it gradually began to open up previously closed areas. By August, all but two of Pester's oil divisions were in full operation. On October 13, the Union made a demand that Coastal Derby bargain with it as the collective bargaining representative of the refinery's production and maintenance unit employees. The unit's rank-and-file employees on that date numbered eighty, forty-three of whom previously had been Pester unit employees represented by the Union. The forty-three employees included the three who had retired and the four who had refused temporary recall. Coastal Derby sent a letter dated October 21 to the Union declaring its refusal to bargain and stating that it did not consider itself a successor employer obligated to recognize the Union.

The Union filed an unfair labor practice charge in which it alleged that Coastal Derby had violated sections 8(a)(1) and (a)(5) of the NLRA. The Administrative Law Judge found that Coastal Derby "did succeed to Pester's obligation to bargain with the Union," and that its failure to do so constituted a violation of both sections of the Act. *See* rec., vol. III, doc. 1 at 8. The Board affirmed the ALJ's rulings, findings, and conclusions, as modified. The Board concluded that the three retirees and four laid-off employees who refused recall were properly included in determining the Union's majority status. Coastal Derby then filed this petition for review of the Board's determination, and the Board cross-petitioned for enforcement of its order.

## II.

■ The standard of review in labor law cases must comport with the considerable authority Congress has given the Board to interpret the provisions of the NLRA. If the Board adopts a rule that is rational and consistent with the Act, then that rule is entitled to deference from the courts. *See NLRB v. Curtin Matheson Scientific, Inc.,* —— U.S. ——, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990); *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987). Additionally, "if the Board's application of such a rational rule is supported by substantial evidence on the record, courts should enforce the Board's order." *Fall River,* 482 U.S. at 42, 107 S.Ct. at 2235; *see also Le'Mon v. NLRB,* 902 F.2d 810, 812 (10th Cir.1990).

### A.

■ The Supreme Court has recently considered the issue of the presumption of a union's majority status in a successorship context. In *Fall River,* 482 U.S. at 37–38, 107 S.Ct. at 2232–33, the Court reaffirmed that a union enjoys a conclusive presumption of majority status for one year following its Board certification as the bargaining representative, and a rebuttable presumption of majority support after that year. *See also NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 279 n. 3, 92 S.Ct. 1571, 1578 n. 3, 32 L.Ed.2d 61 (1972); 29 U.S.C. § 159(c)(3) (1988). A change of ownership does not affect either presumption of majority support "[i]f the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor [because] the bargaining obligation

of § 8(a)(5) is activated." [3]  *Fall River*, 482 U.S. at 41, 107 S.Ct. at 2234. The presumptions thus will carry over in a successorship situation "so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor." *Id.*

The Supreme Court has explained at some length the rationale for the rule in successorship cases. The overriding goal of the NLRA is the promotion of "industrial peace," and the presumptions of majority support further this goal by encouraging stability in the workplace. Specifically, the presumptions "enable a union to concentrate on obtaining and fairly administering a collective-bargaining agreement without worrying that, unless it produces immediate results, it will lose majority support and will be decertified." *Id.* at 38, 107 S.Ct. at 2233 (citing *Brooks v. NLRB*, 348 U.S. 96, 100, 75 S.Ct. 176, 179, 99 L.Ed. 125 (1954)). The presumptions also dissuade an employer from delaying good-faith bargaining in order to encourage the erosion of a union's support.

The presumptions are particularly vital in the successorship context, when a union is in a vulnerable position and has not yet had time to develop a bargaining relationship with the new employer. Without the presumptions, employees "might be inclined to shun support for their former union, especially if they believe that such support will jeopardize their jobs with the successor or if they are inclined to blame the union for their layoff and problems associated with it." *Id.* at 40, 107 S.Ct. at 2234. In these circumstances, employers might be encouraged to use successorship as a means of getting rid of a union. *Id.*

## B.

■ Two inquiries must be made in resolving whether Coastal Derby committed an unfair labor practice by refusing to recognize and bargain with the Union.

First, the Board determines whether Coastal Derby was a successor to Pester. To do so, the Board must look at the totality of the circumstances and "focus on whether the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *Id.* at 43, 107 S.Ct. at 2236 (quoting *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973)). "Substantial continuity" between enterprises is primarily a fact question, and the factors the Board must examine include: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisions; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. *See id.* All these factors should be assessed with special emphasis on the employees' perspective. The Board must attempt to ascertain "whether 'those employees who have been retained will understandably view their job situations as essentially unaltered.'" *Id.* (quoting *Golden State Bottling Co.*, 414 U.S. at 184, 94 S.Ct. at 425). The second step in the process is, theoretically, a more straightforward one: the Board must determine whether the majority of the successor's workforce was employed by its predecessor.

### 1. Successor Business

■ The ALJ found that substantial continuity existed between the operations of Coastal Derby and those of Pester. He noted that although Pester operated the refinery on a reduced scale, there was no hiatus in between the two companies' operations. He found that Coastal Derby's running of the refinery constituted essentially the same business as Pester had conducted; that former Pester employees

---

3.  Of course, the successor is under no obligation to hire the predecessor's employees, although it may not discriminate on the basis of union membership. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 40, 107 S.Ct. 2225, 2234, 96 L.Ed.2d 22 (1987). Nor is the successor bound to honor the collective bargaining agreement of the predecessor. *See id.; NLRB v. Burns Int'l Sec. Servs. Inc.*, 406 U.S. 272, 281–91, 92 S.Ct. 1571, 1579–84, 32 L.Ed.2d 61 (1972).

were doing the same jobs under the same working conditions under the same management and most of the same supervisors; and that they were producing the same products utilizing the same machinery and the same equipment. *See* rec., vol. III, doc. 1 at 7–8. Moreover, Coastal Derby sold these products largely to the same customers.

■ Coastal Derby argues that the Board erred by failing to address the employees' expectations of rehire. It contends there was evidence that a number of Pester's employees had little expectation they would ever be rehired to work in the refinery. However, the expectation of rehire is not among the factors listed in *Fall River* to determine substantial continuity. *See* 482 U.S. at 43, 107 S.Ct. at 2236. Instead, Coastal Derby's assertion that the Board should have assessed the employees' expectation of rehire is undermined by *Fall River*. There, the predecessor company laid off most of its employees in February 1982 because it was in financial difficulty, and it operated with a skeleton crew to liquidate the inventory and maintain the machinery while the president of the company looked for a partner to resurrect the business. *Id.* 107 S.Ct. at 2229. The company ceased business entirely in the summer of 1982, made an assignment for the benefit of its creditors, and disposed of its remaining assets at auction. *Id.* 107 S.Ct. at 2230. We fail to see how the predecessor's employees in *Fall River* could have expected to be rehired in the sense suggested here by Coastal Derby.

The successorship cases Coastal Derby relies on in support of its position that the Board should have considered the expectation of rehire all emphasize that it is the assessment of the length of hiatus that is relevant to determining continuity of operations, and that expectation of rehire is only pertinent insofar as it informs this issue. *See Aircraft Magnesium*, 112 L.R.R.M. (BNA) 1147, 1149 (1982); *Mondovi Foods Corp.*, 98 L.R.R.M. (BNA) 1102, 1104 (1978); *Radiant Fashions, Inc.*, 82 L.R.R.M. (BNA) 1742, 1745 (1973).[4] It is undisputed that the ALJ addressed the hiatus issue, finding no hiatus between Pester's and Coastal Derby's operation of the refinery. Coastal Derby argues to the contrary that, with respect to the majority of Pester's employees, there was a hiatus of over a year which substantially reduced the Pester employee's expectation of rehire.

■ The relevant inquiry is whether the hiatus was of such length as to call into question the likelihood that former Pester employees viewed their current jobs as essentially unchanged. In *Fall River*, the Supreme Court addressed whether a seven-month hiatus was determinative of the successorship question, concluding that "such a hiatus is only one factor in the 'substantial continuity' calculus and thus is relevant only when there are other indicia of discontinuity." 482 U.S. at 45, 107 S.Ct. at 2237. We have reviewed the record, and we agree with the ALJ that numerous factors exist supporting its finding of substantial continuity between Pester's and Coastal Derby's operations. We therefore conclude, as did the Court in *Fall River*, that if there was any hiatus, it did not call into question the substantial continuity between the businesses.[5]

## 2. Majority Status

The ALJ also resolved the second inquiry in favor of the Union, finding that the

**4.** Coastal Derby cites several other cases in support of its position, but these cases discuss whether laid-off employees had a reasonable expectation of recall on the date of election and thus were eligible to vote. *See United States Aviex Co.*, 122 L.R.R.M. (BNA) 1293 (1986); *D.H. Farms Co.*, 84 L.R.R.M. (BNA) 1182 (1973). Such cases have little application to the matter at hand.

**5.** Coastal Derby's assertion that there was an extensive hiatus is contradicted by the fact that Pester continued to operate the refinery up until

the exchange of assets, albeit on a limited basis. In *Fall River*, by contrast, the older company retained only a skeleton crew to ship out goods remaining in the plant and to maintain the building and machinery, but did not continue any operations. Moreover, the Court questioned whether the existence of the skeleton crew and the company's efforts to find a buyer for it may have made the hiatus much less than seven months from the employees' perspective. Analogous facts exist here.

former Pester workers employed by Coastal Derby constituted a majority of the latter's workforce.[6]  *Id.* at 7.  Coastal Derby challenges this finding.  It asserts that the rebuttable presumption should not have been applied to the retirees and laid-off workers who refused recall, and that the Board therefore erred in concluding that forty-three of eighty Coastal Derby employees were previously employed by Pester, thus constituting a majority.

■ At first blush, Coastal Derby's argument, that the Board should examine the employees' likely desires for continued Union representation before presuming that they do support the Union, seems directly contrary to the most recent Supreme Court precedent.  The Court has held that when the Board finds a company to be a successor of the old employer, the duty to bargain is triggered if a "majority of its employees were employed by its predecessor."  *Fall River*, 482 U.S. at 41, 46, 107 S.Ct. at 2234, 2237.  In general, whether employees actually desire continued representation is an inquiry the Board must make only to determine whether the successor employer has rebutted the presumption of majority support for the union.  In this case, however, the Board did consider whether the retirees and laid-off workers were appropriately counted as part of Pester's bargaining unit for purposes of the majority determination.  Specifically, the Board rejected Coastal Derby's contention that the employees at issue were not "former" Pester employees, but "new" Coastal Derby employees.

■ Addressing first the retirees, we conclude there was substantial evidence to support the Board's determination that the retired "employees' attachment to the unit and their expectations concerning representation under a new owner ... [were] virtu-

ally the same as those who were able to stay on the payroll until the sale."  Rec., vol. III, doc. 4 at 5–6.  To draw this conclusion, the Board relied in particular on the fact that the retirements were not self-initiated but were instead encouraged by Pester, and that the retirees readily accepted full-time positions when they became available.  These factors indicate the retirees had not abandoned interest in their unit and, from their perspective, were former Pester employees.  Coastal Derby places considerable emphasis on the fact that the Union acquiesced to a number of changes in the pension plan which reduced the benefits paid out under it, arguing that the retirees' support for the Union must have been undermined by its acting adversely to their interests.  We note initially that these changes would ultimately affect *all* employees, not just the retirees, and that once the retirees returned to work, their status was equivalent to the other former Pester employees.  The fact that the Union accepted certain modifications to help a struggling company save money, and thus prevent a complete refinery shutdown, does not persuade us that the retirees should not be counted.  Whether the retirees were in fact dissatisfied with the Union over handling of the pension plan is of no relevance for counting purposes[7] because the Supreme Court has explicitly stated that such dissatisfaction is to be expected.  *See Fall River*, 482 U.S. at 40 & n. 7, 107 S.Ct. at 2234 & n. 7.  Finally, we find no support for Coastal Derby's assertion that the status of retirees as new employees in a non-successorship context should apply here also.  *Cf. Cincinnati Bronze*, 129 L.R.R.M. (BNA) 1168 (loss of seniority rights and "new" employee status if rehired after retirement does not preclude retired em-

---

6. The Board essentially adopted the ALJ's recommended order, but it elaborated on the finding that a majority of Coastal Derby's workforce was made up of former Pester employees.  The Board concluded there was no evidence that the retired status of the three employees affected their attitudes toward continued Union representation, nor was there evidence that the four laid-off employees who refused recall were expressing an abandonment of interest in the unit.  *See* rec., vol. III, doc. 4 at 5–6.

7. Dissatisfaction with a union may help to rebut the presumption, as we discuss above.  The cases Coastal Derby cites involving replacement workers concern rebutting the presumption rather than undermining its initial application.  *See Buckley Broadcasting Corp.*, 125 L.R.R.M. (BNA) 1281 (1987); *see also Curtin Matheson*, 110 S.Ct. 1542.

 

ployees from being considered "old" employees of the predecessor).

█ The Board also concluded that the laid-off employees who declined temporary recall should be counted because the recall they had been offered would not have restored them to their former permanent positions. We observe that at least one of those employees had acquired a new job *through* the Union, and that all four readily accepted the offer of full-time positions when made. We agree with the Board that their refusal of short-term employment thus "cannot be viewed as abandonment of interest in the unit." Rec., vol. III, doc. 4 at 6.

█ Once the presumption of majority support is determined to apply, the final inquiry is whether Coastal Derby has successfully rebutted the presumption. It is presumed that newly hired employees support a union in the same proportion as the predecessor's employees, unless the employer shows that a majority of the holdover or newly hired employees reject the union. *See NLRB v. Edjo, Inc.*, 631 F.2d 604, 607 (9th Cir.1980). To do so, the successor may show "that, at the time of the refusal to bargain, either (1) the union did not *in fact* enjoy majority support, or (2) the employer had a 'good faith' doubt, founded on a sufficient objective basis, of the union's majority support." *Curtin Matheson Scientific*, 110 S.Ct. at 1545; *see also Johns–Manville Sales Corp. v. NLRB*, 906 F.2d 1428, 1431 (10th Cir.1990).

With respect to the three retirees, Coastal Derby contends that the Union "abandoned" them and acted in a manner detrimental to their interests, and that their knowledge of the Union's actions supports a conclusion that their desire for continued representation by the Union must certainly have ceased. Coastal Derby cites no evidence whatsoever to establish that the Union actually lacked majority support from the eighty Coastal Derby employees. Instead, Coastal Derby only speculates that the three retirees might no longer support the Union. *See* Petitioner's Brief at 31. Coastal Derby therefore failed to rebut the presumption.

The Petition for review is denied and the petition for enforcement of the order is granted.